Calvin L. BAIRD, Sr., Petitioner,

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 93–3975.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 23, 1994.

Decided Nov. 10, 1994.

G. Thomas Blankenship (argued and briefed), Blankenship & Robbins, Indianapolis, IN, for petitioner.

M. Bradley Flynn (argued and briefed), U.S. Dept. of Agriculture, Office of the Gen. Counsel, Washington, DC, for respondent.

Before: KRUPANSKY, GUY, and NORRIS, Circuit Judges.

RALPH B. GUY, JR., Circuit Judge.

Petitioner appeals the decision of the Secretary of the United States Department of Agriculture ("Secretary") finding that he violated 15 U.S.C. § 1824(2)(D) on two separate occasions by allowing horses he owned to be exhibited and entered in a horse show while

the horses were "sore." Because we find that petitioner actually attempted to prevent, rather than allow, the exhibition or entry of his horses while they were sore, we reverse.

## I.

Before addressing the circumstances surrounding petitioner's violations, a discussion of the relevant statutory framework is necessary to bring the issues involved in this appeal into sharper focus.

### A. Statutory Framework

The Horse Protection Act ("Act") prohibits:

> The (A) showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore, (B) entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore, (C) selling, auctioning, or offering for sale, in any horse sale or auction, any horse which is sore, and (D) *allowing any activity described in clause (A), (B), or (C) respecting a horse which is sore by the owner of such horse.*

15 U.S.C. § 1824(2) (emphasis added).[1]

The Act defines "sore" in the following manner:

> (3) The term "sore" when used to describe a horse means that—
>
> (A) an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse,
>
> (B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse,

(C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or

(D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse,

and, as a result of such application, infliction, injection, use, or practice, such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving, except that such term does not include such an application, infliction, injection, use, or practice in connection with the therapeutic treatment of a horse by or under the supervision of a person licensed to practice veterinary medicine in the State in which such treatment was given.

*Id.* § 1821(3). A horse is presumed to be sore "if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs." *Id.* § 1825(d)(5).

Individuals found to have violated § 1824 are subject to civil and criminal penalties. In the case of the former, 15 U.S.C. § 1825(b)(1) provides in pertinent part that "[a]ny person who violates section 1824 of this title shall be liable to the United States for a civil penalty of not more than $2,000 for each violation."

> In determining the amount of such penalty, the Secretary shall take into account all factors relevant to such determination, including the nature, circumstances, extent, and gravity of the prohibited conduct and, with respect to the person found to have engaged in such conduct, the degree of

---

1. The Fourth Circuit recently discussed the purpose underlying the Horse Protection Act.

   Congress enacted the Horse Protection Act to end the practice of deliberately making Walkers "sore" for the purpose of altering their natural gait and improving their performance at horse shows. When the front limbs of a horse have been deliberately made "sore," usually by using chains or chemicals, "the intense pain which the animal suffered when placing his forefeet on the ground would cause him to lift them up quickly and thrust them forward, reproducing exactly [the distinctive high-stepping gait of a champion Walker]." Congress' reasons for prohibiting this practice

were two-fold. First, it inflicted unnecessary pain on the animals; and second, those who made their animal "sore" gained an unfair competitive advantage over those who relied on skill and patience. In 1976, Congress significantly strengthened the Act by amending it to make clear that intent to make a horse "sore" is not a necessary element of a violation.

*Elliott v. Administrator, Animal and Plant Health Inspection Serv.,* 990 F.2d 140, 144–45 (4th Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 191, 126 L.Ed.2d 149 (1993); *see also Thornton v. United States Dep't of Agric.,* 715 F.2d 1508, 1511 (11th Cir.1983).

culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business and such other matters as justice may require.

*Id.* § 1825(b)(1).

The Secretary may also disqualify a person required to pay such a fine "from showing or exhibiting any horse ... for a period of not less than one year for the first violation and not less than five years for any subsequent violation." *Id.* § 1825(c).

### B. Factual Background & Procedural History

In October 1987, "Handshaker's Carbon," a Tennessee Walking Horse owned by Calvin Baird, was entered in the Ohio Celebration, a horse show in Columbus, Ohio. This was by no means Baird's first foray into the world of horse shows. Baird had owned over 50 such horses and had entered some of these horses in shows as often as, if not more than, 100 times per year.

The task of training Handshaker's Carbon for the Ohio Celebration belonged to Charles Roach. Prior to Handshaker's Carbon's performance, Roach worked the horse with eight ounce chains for "about 15, 20 minutes to see that he was ready, to prepare him for the horse show." Handshaker's Carbon subsequently underwent and passed a pre-show inspection conducted by the show's Designated Qualified Person ("DQP").[2] Following this inspection, Roach put the horse through an additional workout: "I took the horse about 20 feet away, 30 feet away from the inspection area ... and grazed the horse as normal, and dropped a six ounce chain on, [rode] him just maybe 40, 60 yards, and I put the rider on, and they rode him about 40, 60 yards."

After Handshaker's Carbon's performance—which was enough to earn it first place honors in its class—the horse was examined by experienced USDA veterinarians,

John R. Clifford and Clement Dussault. As a result of their examinations, both Clifford and Dussault concluded that Handshaker's Carbon was "sore" within the meaning of the Act. They documented their findings in a Summary of Alleged Violations ("SAV") form and in affidavits. In his affidavit, Clifford noted: "I found the horse to be sore in the pocket on the flexor surface of the pastern of both front feet. Upon digital pressure in the location described above this horse would try to pull [its] foot away." The SAV form was given to a USDA investigator, Allen Christian, who then interviewed Roach. Roach informed Christian that Baird not only owned the horse, but also had entered it in the show.

In April 1990, another of Baird's horses, "Cabbage Row Joe," was entered in the Kiwanis Club Walking Horse Show ("Kiwanis Club show") in Murfreesboro, Tennessee. Unlike Handshaker's Carbon, Cabbage Row Joe, who was trained by David Brown, did not even make it past the DQP's examination. As had been the case with Handshaker's Carbon, two experienced USDA veterinarians, Allen M. Knowles and Tyler Riggins, conducted independent examinations of Cabbage Row Joe. These examinations confirmed what the DQP had already determined; namely, that Cabbage Row Joe was sore. Knowles and Riggins completed a SAV form and also signed affidavits attesting to their findings.

Knowles' affidavit, which was signed two days after the examination, stated:

> I approached the left side of the horse and picked up the left front foot. I found a moderate pain response on the anterior pastern. The horse tried to withdraw his foot and tightened his abdominal muscles when the painful area was palpated. I moved to the right foot and found an extreme pain response on the anterior pastern. The horse tried to withdraw his foot, tightened his abdominal muscles, and shift-

---

2. Title 15 U.S.C. § 1823(c) provides in pertinent part: "The Secretary shall prescribe by regulation requirements for the appointment by the management of any horse show ... of persons [*e.g.*, DQPs] qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter."

*See also id.* § 1824(3) (prohibiting "[t]he failure by the management of any horse show or horse exhibition, which does not appoint and retain a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse which is sore[ ]").

ed his weight to his rear feet when the painful area was palpated.

I then asked Dr. Riggins to examine the horse while I watched. The horse showed excessive movement of the forelimbs along with tightening of the abdominal muscles and shifting of weight to the rear feet when the painful areas were palpated.

I dismissed the horse and we watched his way-of-going as he was lead away. The horse was somewhat reluctant to lead, but it was not pronounced.

We found this horse sore as defined by the Horse Protection Act. I informed Mr. Brown of our findings. Information was taken from Mr. Brown by Jimmy Odle and recorded along with our findings on form 19–7.

In my professional opinion the pain exhibited by this horse was caused by a combination of caustic chemicals and/or action devices.

In his affidavit, which he signed 16 days after examining Cabbage Row Joe, Riggins observed:

I observed DQP Bob Flynn examine [Cabbage Row Joe]. Mr. Flynn got a pain response in both front feet when pressure was applied to the pastern areas. He turned the horse down and would not allow it to show. Immediately Dr. Knowles checked the horse and the horse reacted painfully to his examination. The horse exhibited a painful response when Dr. Knowles palpated the pastern areas of both front feet.

When Dr. Knowles had finished his examination I examined the horse. I first palpated the posterior pastern of the left front foot. The horse did not exhibit any pain. Then I applied pressure to the anterior pastern of the same foot, I observed a moderate pain reflex. The horse would jerk its foot.

Then I palpated the posterior pastern of the right front foot and again did not observe any painful reaction. I palpated the anterior pastern of the same foot and

got an extreme pain reaction by the horse jerking the foot, tightening its abdominal muscles and raising of the head.

Dr. Knowles informed the trainer, Mr. David Brown, that the horse met the criteria of a sore horse and that an alleged violation case would be prepared.

In my professional opinion the soring of the horse's feet was caused by a caustic chemical or mechanical device or a combination of the two.

In January 1990, the Acting Administrator of the Animal and Plant Health Inspection Service ("APHIS") filed a complaint, charging Roach and Baird with violating the Act. Specifically, Roach was said to have violated 15 U.S.C. § 1824(2)(A) and (B), by exhibiting and entering Handshaker's Carbon at the Ohio Celebration. Baird, it was alleged, had violated 15 U.S.C. § 1824(2)(D) by allowing such exhibition and entry. Roach subsequently signed a consent decision and therefore is not a party to this appeal.

In an additional complaint filed in October 1990, APHIS again charged Baird with violating 15 U.S.C. § 1824(2)(D), this time for having allowed the entry of Cabbage Row Joe at the Kiwanis Club show. This complaint also alleged that Brown had entered the horse in violation of 15 U.S.C. § 1824(2)(B). Brown, like Roach, signed a consent decision.

An administrative law judge ("ALJ") held a hearing on these complaints in September 1991. In a decision issued in March 1992, the ALJ found in favor of APHIS, concluding that Baird had violated § 1824(2)(D) with respect to both Handshaker's Carbon and Cabbage Row Joe.[3] The ALJ imposed a civil penalty of $4,000 against Baird and disqualified him from showing or exhibiting horses for a period of one year.

Baird appealed to the USDA's Judicial Officer ("JO"), who affirmed the ALJ's decision. This appeal followed.

---

3. In the case of Handshaker's Carbon, the ALJ apparently concluded that the horse was sore at the time it was *exhibited* and that Baird had allowed it to be exhibited in such state. As the ALJ added, however, "I do not find that the evidence shows that the horse was sore when entered." As to Cabbage Row Joe, on the other hand, the ALJ determined that this horse was indeed sore when it was entered.

## II.

We consider Baird's assignments of error in light of the operative standard of review. "Review of the USDA's administrative decision under the Horse Protection Act is limited to determining whether the proper legal standards were employed and substantial evidence supports the decision."[4] *Fleming v. United States Dep't of Agric.*, 713 F.2d 179, 188 (6th Cir.1983).

To prove a violation of 15 U.S.C. § 1824(2)(D), the government has to establish by a preponderance of evidence that (1) the person charged is the owner of the horse in question; (2) the horse was shown, exhibited, or entered in a horse show or exhibition; (3) the horse was sore at the time it was shown, exhibited, or entered; and (4) the owner allowed such showing, exhibition, or entry. As to the first three elements of the above test, we are not persuaded that, based upon the evidence, the JO reached the wrong conclusion.[5] Whether Baird *allowed* Handshaker's Carbon and Cabbage Row Joe to be exhibited and entered while they were sore, however, presents a more difficult question.

Baird contends that he cannot be held liable for allowing the exhibition in Handshaker's Carbon's case or the entry in Cabbage Row Joe's case because he did not know that the horses were sore and because he specifically instructed Roach and Brown not to sore the horses they were training. The government, on the other hand, argues for something akin to strict liability; it maintains that Baird's knowledge of the horses' condition and the instructions he claims to have issued are immaterial for purposes of determining his liability under the Act. In short, the government urges this court to adopt the JO's reasoning and "rule that an owner violates the Act whenever he or she allows a person to enter or exhibit a sore horse in a horse show, unless the person enters or exhibits the horse without the owner's permission or acquiescence."[6]

Although this court has not previously considered the meaning of the term "allow" for purposes of assigning liability under 15 U.S.C. § 1824(2)(D), the Eighth Circuit has

---

**4.** As we explained in *Murphy v. Secretary of Health and Human Services*, 801 F.2d 182 (6th Cir.1986):

> Substantial evidence is more than a mere scintilla. It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." "Substantiality of the evidence must be based upon the record taken as a whole." "Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the 'substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"

*Id.* at 184 (citations omitted).

**5.** Baird argues that "soreness" encompasses two separate considerations: (1) causation and (2) result. "That is, in order to satisfy the very definition of the violations alleged in this case, the USDA must prove that Baird *allowed exhibition and entry* of the horses, at a time when a specific *cause* created a specific *result* in the horses." Even if we were to follow Baird's suggested analysis, however, we would reach the same conclusion regarding whether Handshaker's Carbon and Cabbage Row Joe were "sore" at the Ohio Celebration and Kiwanis Club shows, respectively. As to both horses, the veterinarians who conducted examinations—and in Cabbage Row Joe's case, the DQP as well—determined that the horse at issue was sore, *i.e.*, that the

government had demonstrated the *result* Baird's analysis would require. *See* 15 U.S.C. § 1825(d)(5) (presuming soreness when a horse "manifests abnormal sensitivity or inflammation in both of its forelimbs"). The *cause* of the horses' condition, too, was addressed by the JO, who stated: "[T]here is no need to rely on the statutory presumption since the Department's veterinarians expressed their expert opinions, which I accept, that the pain was caused by the use of action devices or chemicals, and that the horses would have been likely to experience the pain while moving."

During his administrative hearing, Baird offered the testimony of two other veterinarians who, he contends, rebutted the findings of their USDA colleagues. These veterinarians opined that an examination more thorough and comprehensive than those routinely conducted by USDA veterinarians is necessary to determine if a violation of the Act has occurred. As the JO correctly pointed out, however, Baird's expert witnesses "did not present any direct evidence pertaining to the particular horses and examinations at issue in these cases, or otherwise show that the horse's pain was due to non-prohibited causes."

**6.** The government essentially tracks the language employed by the JO, who held that "an owner will be held accountable for allowing a horse to be entered while sore unless the horse was en-

addressed the matter.[7] In *Burton v. United States Department of Agriculture*, 683 F.2d 280 (8th Cir.1982), the court was confronted with a factual scenario largely analogous to the one at bar. The owner of a walking horse, who had been found to have violated § 1824(2)(D), argued on appeal that " 'allow' requires that one must know the horse was 'sore' at the time it was exhibited." *Id.* at 282. The government, as it does here, "urge[d] that owners be held to a strict liability standard, and that knowledge of the horse's 'soreness' is not required under 15 U.S.C. § 1824(2)(D)." *Id.* Noting the absence of expressed congressional intent suggesting the legitimacy of the government's position, the court ruled in favor of the owner and reversed the Secretary, stating:

> [W]e hold that the owner cannot be held to have "allowed" a "sore" horse to be shown when the following three factors are shown

to exist: (1) there is a finding that the owner had no knowledge that the horse was in a "sore" condition, (2) there is a finding that a Designated Qualified Person examined and approved the horse before entering the ring, and (3) there was uncontradicted testimony that the owner had directed the trainer not to show a "sore" horse. All of these factors taken together are sufficient to excuse an owner from liability.

*Id.* at 283.[8]

■ Although we agree with the conclusion that § 1824(2)(D) does not establish a strict liability standard,[9] we do not read the three-pronged analysis set forth in *Burton* as constituting a hard-and-fast test to determine whether an owner has violated the provision. Instead, *Burton*, in our view, provides guidance for courts reviewing cases like the one at bar, and it does so by enumerating a set of

tered without the owner's permission or acquiescence."

**7.** We declined to pass on the meaning of "allow" in *Fleming v. United States Department of Agriculture*, 713 F.2d 179, 181 n. 2 (6th Cir.1983): There is no claim in these cases that the owners of the sored horses did not "permit" their horses to be shown in a sored condition. *See* 15 U.S.C. § 1824(2)(D). We are not, therefore, presented with the issue of whether an owner who expressly forbids soring, is not present at the show and has no actual knowledge that his horse is sored may nonetheless be held responsible under the Act. For this reason we decline the USDA's invitation to express any opinion as to the correctness of the Eighth Circuit's decision in *Burton v. United States Department of Agriculture*, 683 F.2d 280 (8th Cir.1982).

**8.** Two other circuits have discussed *Burton* without ruling on the propriety of its holding. In *Thornton v. United States Dep't of Agriculture*, 715 F.2d 1508 (11th Cir.1983), the Eleventh Circuit considered whether " 'allowing' in 15 U.S.C. § 1824(2)(D) requires a showing that the owner knew the horse was sore at the time it was shown." *Id.* at 1511. The *Thornton* court answered this question in the negative and took note of the *Burton* decision:

> We are inclined to agree with *Burton* that the Horse Protection Act does not impose absolute liability even when there is credited testimony that the alleged horse soring was expressly contrary to the instructions of the horse owner. In this case, however, in addition to denying that the horse was sored, Thornton contends only that he did not positively direct the trainer to sore the horse. We find this factual difference to be legally significant and the absence

of a positive direction to sore to be insufficient to escape civil liability under the Act.

*Id.* at 1512 n. 5.

Similarly, the Ninth Circuit, in *Stamper v. Secretary of Agriculture*, 722 F.2d 1483 (9th Cir.1984), observed:

> We find it unnecessary in this case to resolve whether *Burton* correctly construed the Act, because the Stampers have failed to satisfy the third factor of the *Burton* test. We have not found, and the parties have not cited, any testimony indicating that the Stampers expressly ordered [the trainer] Fox not to show [the horse] Playboy if he were sore. At most, the testimony indicates that the Stampers did not affirmatively order Fox to show Playboy with knowledge that he was sore. We agree with the Eleventh Circuit that this factual difference from *Burton* is legally significant. There is no question that the Stampers permitted Playboy to be shown. Under these circumstances, the absence of the Stampers' knowledge of the horse's soreness is insufficient to negate the Stampers' civil liability under the Act. Even under the *Burton* test the Stampers may be held liable. We need not decide whether a more stringent test is applicable.

*Id.* at 1489 (footnote omitted).

The instant case, unlike *Thornton* and *Stamper*, is indistinguishable from *Burton* insofar as Baird, as had the petitioner in *Burton*, contends that he instructed his trainers not to sore the horses under their charge.

**9.** In reaching this conclusion, we do not intend to suggest that Congress could not, if it wanted to, establish a strict liability scheme in this instance. We hold only that it has not, in fact, done so here.

relevant factors to consider, a set that is not necessarily exhaustive.

At the heart of this controversy is, of course, the meaning of "allow." Black's Law Dictionary offers the following definition of the word:

> [Allow] has no rigid or precise meaning, its import varying according to circumstances or context in connection with which it is used. It may mean to bestow or assign to any one as his right or due. To approve of, accept as true, admit, concede, adopt or fix. To grant something as a deduction or an addition; to abate or deduct; as, to allow a sum for leakage. *To sanction, either directly or indirectly, as opposed to merely suffering a thing to be done; to acquiesce in; to suffer; to tolerate.*

Black's Law Dictionary 76 (6th ed.1990) (citation omitted) (emphasis added).

Notwithstanding its somewhat protean character, the word "allow" surely is not broad enough to encompass the interpretation proposed by the agency. As the above definition makes clear, there are basically two ways to allow something to happen: either "directly," *e.g.*, explicitly condoning or authorizing the conduct or act in question; or "indirectly," *e.g.*, by failing to prevent such conduct or act—in other words, by "looking the other way" or by "burying one's head in the sand." In this sense, allowing is not tantamount to knowing. To illustrate: if a horse owner knows about the condition of his sore horse and does not attempt to prevent that horse from being entered, shown, or exhibited at a horse show, it can fairly be said that the owner "allowed" the horse to be so entered, shown, or exhibited, in violation of § 1824(2)(D). The opposite, however, does not always hold true; that is, an owner who does not know that a horse he owns is sore—which horse is entered, shown, or exhibited at a horse show—may yet be found to have violated § 1824(2)(D), notwithstanding his ignorance. Liability would follow in this latter instance if, for example, an owner had cultivated a training atmosphere conducive to soring, or had done nothing to dissuade the practice, knowing the tactics of his trainers in particular and/or the pervasiveness of the practice in general.

■ In our view, the government must, as an initial matter, make out a prima facie case of a § 1824(2)(D) violation. It may do so by establishing (1) ownership; (2) showing, exhibition, or entry; and (3) soreness. If the government establishes a prima facie case, the owner may then offer evidence that he took an affirmative step in an effort to prevent the soring that occurred. Assuming the owner presents such evidence and the evidence is justifiably credited, it is up to the government then to prove that the admonitions the owner directed to his trainers concerning the soring of horses constituted merely a pretext or a self-serving ruse designed to mask what is in actuality conduct violative of § 1824.[10]

10. In rejecting the interpretation of "allow" proposed by the agency, we are mindful of the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron*, the Court ruled that an agency's interpretation of a statute it is charged with administering is due deference by a reviewing court. The Court, however, added a few caveats to its rule of deference. For instance, it instructed that deference was to be accorded only when Congress had not spoken directly to the precise question at issue; if Congress had already resolved the interpretive dispute, courts were to prefer Congress's stance to that of the agency.

The Court also counseled that an agency's interpretation is entitled to deference so long as it is *reasonable*. This caveat signals the Court's recognition that a given statutory provision, particularly one that is ambiguous, often yields not one "correct" interpretation but numerous plausible ones. Thus, the mere fact that a court disagrees with an agency's reading of a statutory provision will not enable the court to ignore that reading in favor of its own. Here, however, we are not persuaded that the interpretation urged by the agency falls within the range of permissible interpretations. In our view, if Congress had wanted to establish a strict liability scheme with regard to § 1824(2)(D), it could have done so clearly and unambiguously. The language of § 1824, however, indicates no intent on the part of Congress to create such a scheme. In fact, the agency's interpretation would effectively rewrite the provision, rendering the requirement that the owner "allow" the horse to be entered, shown, or exhibited while sore a nullity.

**138**

■ Here, as noted above, the government did indeed establish a prima facie case. In response, Baird testified that, as a general matter, he would direct his trainers not to sore his horses and that he would take horses away from trainers he suspected of contravening his directive ("I have it definitely understood that anybody that has a horse of mine, that I do not want that horse sored, period."). Baird further testified that both Brown and Roach understood his feelings on the issue of soring. The government did not offer evidence to contradict Baird's testimony [11] and, accordingly, failed to establish pretext. For this reason, the Secretary's finding that Baird violated § 1824(2)(D) with respect to the exhibition of Handshaker's Carbon at the Ohio Celebration and the entry of Cabbage Row Joe at the Kiwanis Club show must be reversed.

In light of this determination, we need not consider Baird's claim that the evidence relied upon by the JO was erroneously admitted. Nor do we address Baird's assignments of error relative to the sanctions that were imposed against him.

**REVERSED.**

---

**11.** The government argues that "it is simple for an alleged violator to proffer a self-serving statement that he or she instructed the trainer not to sore a horse, without fear of contradiction." *See Stamper v. Secretary of Agric.,* 722 F.2d 1483, 1488–89 (9th Cir.1984) ("[T]he Department contends, trainers will not testify against the owners of horses, because such testimony would not negate the trainers' own violations of the Act and would limit the trainers' future employment."). The risk that witnesses will be less than truthful, however, is something that is present in any adjudicatory proceeding that relies on witness testimony. Indeed, although the risk may be diminished to a degree by the specter of a perjury prosecution or through effective cross-examination, there is no guarantee that a particular witness will not lie, especially when lying serves that witness's own interests. The system thus acknowledges the inevitable, *i.e.,* that some slippage (in the form of untruthfulness) will and does occur. We see no reason why this dynamic should be altered in the immediate context; in fact, the language of Act compels us not to do so.