**Sheryl CRAWFORD, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 93–1852.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1995.

Decided March 31, 1995.

John M. Harmon, Austin, TX, argued the cause and filed the briefs, for petitioner.

Jeffrey A. Knishkowy, Atty., U.S. Dept. of Agriculture, Washington, DC, argued the cause, for respondent. With him on the brief, was James M. Kelly, Associate Gen. Counsel, U.S. Dept. of Agriculture, Washington, DC. Raymond W. Fullerton, Washington, DC, entered an appearance.

Before: WALD, SILBERMAN, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioner, a horse owner, challenges a civil penalty imposed under the Horse Protection Act for "allowing" the entry of a "sored" Tennessee Walking horse in a horse show. We deny the petition for review.

## I.

Petitioner Sheryl Crawford owns and shows "Supreme Image," a Tennessee Walking horse. Such horses are prized for their distinctive high-stepping gait. Unfortunately, the competitive pressures of the Tennessee Walking horse industry have led some owners to "sore" their horses, inflicting injuries on the horses' forelimbs to alter their gait and improve their performance at horse

shows. *American Horse Protection Ass'n v. Lyng*, 812 F.2d 1–2 (D.C.Cir.1987). Congress responded in 1970 with the Horse Protection Act (HPA or Act), 15 U.S.C. § 1821 *et seq.* (1988), which outlaws such practices.[1] The Act prohibits—with respect to "any horse which is sore"—the "showing or exhibiting," "entering for the purpose of showing or exhibiting in any horse show or horse exhibition," and the "allowing" of the entry, showing or exhibition of such a horse. 15 U.S.C. § 1824(2)(A)–(D). Per Congress' 1976 amendments to the HPA, the government need not prove intent to sore in order to establish civil—as opposed to criminal— liability.[2] *See Thornton v. United States Dep't of Agriculture*, 715 F.2d 1508, 1511–12 (11th Cir.1983).

Petitioner entered "Supreme Image" in the Belfast Lions Club Horse Show in Belfast, Tennessee, on August 1, 1986. Supreme Image was trained by Cecil Jordan; petitioner testified that she had specifically instructed Jordan not to sore the horse. Petitioner paid the entry fee and intended to ride Supreme Image in the show. Upon Jordan's presentation of the horse to the Designated Qualified Person (DQP) prior to the show, however, Supreme Image was rejected for the competition.[3] Two Department of Agriculture veterinarians, Knowles and Riggins, responsible for monitoring the DQPs and compliance with the Act, then examined Supreme Image and determined that the horse was sore within the Act's definition. The veterinarians recorded their observations.

On September 28, 1990, more than four years after the show, the Administrator of the Animal and Plant Health Inspection Service (APHIS), an agency within the Department, instituted a disciplinary proceeding under the HPA against petitioner for "allowing" the entry of a sored horse in the Belfast show. A hearing was held on June 27, 1991, at which petitioner disputed both whether Supreme Image was sore, and whether Crawford had "allowed" the entry of a sore horse. In his Initial Decision and Order filed January 30, 1992, the ALJ discounted the reliability of the government's supporting documentation establishing that Supreme Image was sore, and dismissed the complaint against petitioner. The ALJ determined the agency did not meet its burden of proving that Supreme Image was "sore"; and he therefore did not reach the question whether Crawford had "allow[ed]" the entry of a sored horse. Although he admitted the reports and affidavits of the Department veterinarians as "probative hearsay," the ALJ found that the documents were not supported by any present recollection, and that the government had presented no corroborating notes or other verification of the accuracy of the veterinarians' examinations. In the absence of independent indicia of trustworthiness of the "hearsay" forms and affidavits, he thought the documents were insufficient to make out the government's case.

The Administrator appealed the Initial Decision to the Department's judicial officer, who vacated the ALJ's decision and remanded, ordering the ALJ to reweigh the evidence

---

1. "Soring" is defined in the HPA as where "an irritating or blistering agent has been applied, internally or externally," "any burn, cut or laceration has been inflicted by a person on any limb of a horse," "any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse," or "any other substance or device has been used" to accomplish soring. 15 U.S.C. § 1821(3)(A)–(D). The Act as amended in 1976 creates a presumption that a horse that "manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs" is sore. 15 U.S.C. § 1825(d)(5).

2. The criminal penalties under the Act are for "knowing" violations, 15 U.S.C. § 1825. A party incurring civil liability under 15 U.S.C. § 1824

"shall be liable to the United States for a civil penalty of not more than $2,000 for each violation …," 15 U.S.C. § 1825(b)(1), and "may be disqualified by order of the Secretary, after notice and opportunity for a hearing before the Secretary, from showing or exhibiting" horses or otherwise participating in the horse industry "for a period of not less than one year for the first violation and not less than five years for any subsequent violation." 15 U.S.C. § 1825(c).

3. The DQP is typically a person employed by the horse show to inspect horses and determine if the horses are sore. DQPs are utilized to protect the show management from liability under the Act. *See* 15 U.S.C. § 1824(3). The DQP here, Charles Thomas, was employed through the National Horse Show Commission.

of soring. The judicial officer concluded that the ALJ had asked for too much, as the APA contemplates reliance upon past recollections recorded as "reliable, probative and substantial evidence." 5 U.S.C. § 556(d). In his Revised Order of January 29, 1993, the ALJ determined that petitioner violated the Act by "allow[ing] a horse owned by her to be entered in a show while the horse was sore." The ALJ assessed a $2,000 civil penalty and disqualified Crawford from showing, exhibiting, entering horses or otherwise participating in horse shows or auctions for one year. Petitioner's appeal to the Department's judicial officer was denied, and this petition for review of the Department's final order followed.

## II.

Petitioner raises two arguments. She challenges the Department's finding that the horse was sore as lacking substantial evidence on the whole record, and also disputes the Department's conclusion that she "allowed" the entry of a sored horse—which involves more a question of statutory interpretation than a finding of historical fact. As to the first argument, petitioner urges us, as she did the Department, to reject the documentary evidence prepared by the Department's veterinarians and offered by the Administrator. The very night of the examination in question, however, Dr. Riggins, one of the two examining veterinarians, filled out a departmental form entitled "Summary of Alleged Violations" which described the horse's reaction to the doctor's "digital palpation," *i.e.*, pressing on the horse's forelimbs to test for pain response. The summary report, stating that the horse reacted repeatedly to the palpation with a pain response and diagraming the location of the soreness, was signed by both veterinarians. Shortly thereafter both doctors prepared and signed affidavits describing the examination (Dr. Knowles three days later on August 4, and Dr. Riggins on August 15).

To be sure, at the hearing four years later, neither doctor had an independent recollection of the events. But contrary to petitioner's contention, administrative agencies are not barred from reliance on hearsay evidence. *See, e.g., Richardson v. Perales*, 402 U.S. 389, 405–06, 91 S.Ct. 1420, 1429–30, 28 L.Ed.2d 842 (1971). Such evidence need only bear satisfactory indicia of reliability, *Hoska v. United States Dep't of the Army*, 677 F.2d 131, 138 (D.C.Cir.1982), and can constitute *substantial* evidence if reliable and trustworthy. *Johnson v. United States*, 628 F.2d 187, 190–91 (D.C.Cir.1980). Nor are the minor inaccuracies in the report—a wrongly recorded digit of the horse's identification number—of such significance as to undermine the document's reliability since the horse was otherwise correctly identified. Four years does seem a long time to await an adjudication. Yet the veterinarians, who examine hundreds of horses at many horse shows—as was brought out at oral argument—would likely forget an actual examination in a much shorter period, so the delay did not prejudice petitioner nor does it appear relevant to the hearsay issue.

Petitioner offered her own testimony and that of her husband, her trainer, and a friend, as to the horse's condition and the circumstances surrounding the examination. Of those witnesses only petitioner observed the veterinarians' examination of the horse (it is perhaps noteworthy that after the DQP rejected Supreme Image, the trainer left the examination area). The others merely testified as to alternative reasons for the horse's reaction to diagnosis, that the horse was agitated because it had been transported with a mare in season and that the examination area, where the horse was required to remain for over an hour, was crowded. Petitioner herself did observe the veterinarians examine the horse and administer digital palpation three times, but she does not contradict directly the doctors' report. She testified only that neither doctor told her the horse was sore.[4] But it does not appear that the veterinarians expressed to her any conclusion one way or another.

It is undisputed, then, that the two doctors examined Supreme Image the night

---

**4.** She did also claim that she overheard Dr. Riggins tell Dr. Knowles that "he could not find anything wrong," but did not know whether he was referring to only one leg.

of August 1, 1986, after the DQP had rejected the horse for ostensible soreness, and that the doctors' summary report described soreness in the horse's legs per the digital palpation diagnostic procedure. Once the veterinarian's reports, which are essentially uncontradicted, are determined to be admissible we think it impossible to conclude that the Department's ruling is not supported by substantial evidence on the whole record. Trying another approach to discredit the reports, however, petitioner disputes the reliability of digital palpation, at least by itself, as a method of determining whether a horse is sore—despite a Department regulation, 9 C.F.R. § 11.1 (1990), which explicitly approves that technique. Petitioner relies on Congress, which she points out, has expressed the same concern as does petitioner. In a recent Appropriations Act, Congress included a rider on the Department's appropriation:

> For expenses, . . . to carry out inspection, quarantine, and regulatory activities; . . . $432,900,000, . . . *provided further*, that none of these funds shall be used to pay the salary of any Department Veterinarian or Veterinary Medical Officer who, when conducting inspections at horse shows, exhibitions, sales, or auctions under the Horse Protection Act, as amended (15 U.S.C. 1821–1831), relies *solely* on the use of digital palpation as the only diagnostic test to determine whether or not a horse is sore under such Act.

Pub.L. No. 102–341, 106 Stat. 873, 881–882 (1992) (emphasis added). It does seem, then, that horse owners were persuasive in making petitioner's argument before Congress, but that was only so *after* the events that gave rise to this case. Obviously we cannot be influenced by Congress' subsequent actions; the legality of the Department's decision has to be judged by the law in effect at the time of the inspection and the proceeding before the Department. And we have no legitimate basis to reject digital palpation as a diagnostic technique, whether used alone or not, prior to the passage of the appropriations rider.

That brings us to petitioner's second argument: that on the facts presented, the Department could not conclude that petitioner "allow[ed]" the entry of a sore horse. This textual argument turns on the meaning of the word "allow." The Department contends that an owner can always *prevent* a horse from being sored, and that therefore an owner is liable if her horse is entered, showed, or exhibited while sore. Petitioner, on the other hand, maintains that the word "allow" necessarily implies knowledge of the sore condition, or at least requires proof of circumstances that would alert the owner that someone—normally, we would suppose, the trainer—was soring the horse. In this case, it will be recalled, the petitioner testified, without contradiction, that she instructed the trainer *not* to sore the horse. Petitioner accuses the Department of interpreting the word "allow" so as to create absolute liability for an owner regardless of the circumstances that caused a horse's soreness.

This issue has generated much discussion and concern in our fellow circuits. The Eighth Circuit, *Burton v. United States Dep't of Agriculture*, 683 F.2d 280, 282–83 (8th Cir.1982), and the Sixth Circuit, *Baird v. United States Dep't of Agriculture*, 39 F.3d 131, 137–38 (6th Cir.1994), have rejected the Department's interpretation and have held that if an owner produced uncontradicted evidence that he or she instructed a trainer not to sore the horse, the Department must in turn show that the instruction was a ruse or that the owner nevertheless had knowledge that the horse was sore. *Compare Thornton v. United States Dep't of Agriculture*, 715 F.2d 1508, 1511–12 (11th Cir.1983); *see also Stamper v. Secretary of Agriculture*, 722 F.2d 1483, 1488–89 (9th Cir.1984).

■ We respectfully disagree with our sister circuits who have required the Department to produce evidence rebutting an owners' prophylactic instruction. Congress did not state that an owner is liable if she *authorizes* or *causes* a horse to be sored. The word "allow" is a good deal softer, more passive, and it can have varying meanings, *e.g.*, "to permit by neglecting to restrain or prevent," or "to make a possibility: provide opportunity or basis" or (most strongly) "to intend or plan." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 58 (1971). Since

the word is ambiguous, we are obliged under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), to defer to the Department's interpretation of the term (so long as reasonable), which we take to be among the weaker ones in Webster's, "to permit by neglecting to restrain or prevent." Accordingly, if an owner enters or shows a sore horse, the Department assumes that he or she has not *prevented* someone in his or her employ from soring the horse. And, *by itself,* testimony that the owner "instructed" the trainer not to sore the horse will not exculpate the owner. In so concluding, the Department merely takes into account the obvious proposition that the owner has the power to control his or her agents.

The Sixth Circuit recognized (in a footnote) that *Chevron* governed review of the Department's interpretation, but concluded the Department's interpretation was unreasonable. *Baird,* 39 F.3d at 137 n. 10. The court looked to Black's Law Dictionary, which does state that " 'allow' has no rigid or precise meaning" but then goes on to say, "[t]o sanction, either directly or indirectly, as opposed to merely suffering a thing to be done" (even that dictionary does, in a contradictory fashion, submit as an alternative, "to suffer; to tolerate"). From that language the court concluded that

> [A]s the above definition makes clear, there are basically two ways to allow something to happen: either 'directly,' *e.g.,* explicitly condoning or authorizing the conduct or act in question; or 'indirectly,' *e.g.,* by failing to prevent such conduct or act— in other words, by 'looking the other way' or by 'burying one's head in the sand.' . . . . Liability would follow in this latter instance if, for example, an owner had cultivated a training atmosphere conducive to soring, or had done nothing to dissuade the practice, knowing the tactics of his trainers in particular and/or the pervasiveness of the practice in general.

*Baird v. U.S. Dep't of Agriculture,* 39 F.3d at 137.

The Sixth Circuit's interpretation of the language is certainly plausible, but we do not agree with its conclusion that the Department's interpretation is unreasonable or is functionally equivalent to the imposition of absolute liability. The Department merely holds the owner responsible for the actions of her agents (particularly the trainer) and will not permit the owner to escape liability by testifying that she instructed a trainer not to sore. It might well be an entirely different case—we have been able to find none—if an owner were able to show that a horse was sored by a stranger or someone not under the owner's control. And, it is of course conceivable that a trainer would flatly disobey an owner's instruction. If an owner produced such evidence—together, presumably, with a showing that the trainer had been terminated—it might well be that the Department could not conclude reasonably that the owner "allowed" the entry of a sore horse. That is not this case, however, and that apparently has not been the pattern of most of these cases.[5]

The Sixth Circuit recognized the government's concern that an owner could easily offer evidence of a prophylactic instruction without real fear of contradiction (trainers would be unlikely to cross the owners), but the court concluded that this risk was simply a hazard of litigation: the government still had the "burden" of disproving the sincerity of the instruction. *Baird,* 39 F.3d at 138 n. 11. That amounts to putting an enormous burden and expense on the Administrator to establish how the horse came to be sored, a burden that would be required if the statute called for a sanction if an owner "caused" or "authorized" the soring. Since the statute uses the term "allow" (*i.e.,* "permit," or "does not prevent"), we do not think the Administrator must shoulder such a task just because the owner produces evidence of her instruction to the trainer. After all, the instruction is not introduced to establish that the horse was not sore but rather to relieve the owner of any responsibility for the soreness. Yet the instruction, by itself, even were it deemed totally sincere, is not necessarily in-

**5.** *But see Baird,* 39 F.3d at 138, where it was at least shown that the owner had taken horses away from trainers engaged in soring.

consistent with the proposition that the owner "permitted"—for example, through neglect or lack of vigilance—the horse to be sored. It is unimaginable that an owner would be unfamiliar with soring practices generally, as well as the Department's enforcement efforts, therefore if an owner's horse were sored, notwithstanding her instruction, she could be said to have "put her head in the sand"—unless something quite extraordinary occurred.

The Department apparently believes that an owner can and must do a good deal more than simply give the bare instruction to be thought to have "prevented" her own horse from being entered in a sore condition. The issue does not involve so much an allocation of burdens, as the Sixth Circuit thought,[6] but rather the weight the Department must give to evidence of the owner's instruction in light of the Department's interpretation of the statute. We do not think, in that context, it is unreasonable for the Department to conclude that such an instruction will not exculpate an owner for the statutory responsibility for allowing the entry of a sore horse.

\* \* \* \* \* \*

For the aforementioned reasons, the petition for review of the Department's order is hereby denied.

**6.** *Compare Director, OWCP v. Greenwich Collieries,* —— U.S. ——, ——–——, 114 S.Ct. 2251, 2257–58, 129 L.Ed.2d 221 (1994) (discussing agency's "burden of persuasion" and production under APA and substantive statute).