Slip Op. 02-103

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| FORMER EMPLOYEES OF BARRY CALLEBAUT | : | |
| Plaintiffs, | : | |
| | : | Before: WALLACH, Judge |
| v. | : | Court No.: 00-05-00202 |
| HERMAN, UNITED STATES SECRETARY OF LABOR, | : | **PUBLIC VERSION** |
| Defendant. | : | |

[Plaintiffs' petitions certified.]                              Decided: August 30, 2002

Coudert Brothers (Steven H. Becker, Paul A. Horowitz, and Scott D. Shauf), New York, NY, for Plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; Velta A. Melnbrencis, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, (James L. Anderson), Washington, D.C., for Defendant.

## OPINION

## I

## INTRODUCTION

This matter concerns Plaintiffs', Former Employees of Barry Callebaut ("Former

Employees"), petitions for Trade Adjustment Assistance ("TAA") and NAFTA Transitional

Adjustment Assistance ("NAFTA TAA"), which were denied for the fourth time in the United

States Department of Labor's ("Labor" or the "Department") Negative Determination on remand

of March 4, 2001. Following a voluntary remand, see Barry Callebaut USA, Incorporated, Van

Leer Division, Jersey City, New Jersey; Notice of Negative Determination on Remand ("Remand Determination"), 66 Fed. Reg. 18,116 (Dep't Labor Apr. 5, 2001), and, subsequently, a remand determination pursuant to court order, see Former Employees. of Barry Callebaut v. Herman, 177 F. Supp. 2d 1304 (CIT 2001), Labor continues to deny Plaintiffs' eligibility for both programs. See Barry Callebaut USA, Incorporated Van Leer Division Jersey City, New Jersey, TA-W-37,000 and NAFTA-3402, Notice of Negative Determination on Remand (Dep't Labor Mar. 4, 2002) ("Second Remand Determination"). For the reasons set forth below, the Secretary must certify the employees' petitions.

## II

### BACKGROUND

Barry Callebaut Van Leer Division (the "Van Leer Plant"), a manufacturing plant in Jersey City, New Jersey, which produced finished chocolate products and related ingredients, began laying off employees in late Spring 1999 and closed in April 2000.[1] On July 9, 1999, employees slated for layoff applied for TAA. Citing the fact that their former employer, Van Leer, was purchased by Barry Callebaut, they claimed that Barry Callebaut was shifting production to Canada, thus triggering their separations. After being laid off, the employees filed a petition for NAFTA TAA, arguing that the layoffs were the result of shifts in production to and imports from Canada.

---

[1] Unless otherwise specified, the summary of events prior to the Second Remand Determination are derived from the court's opinion in Former Employees. of Barry Callebaut v. Herman, 177 F. Supp. 2d 1304 (CIT 2001).

Labor initiated an investigation in which it sent a NAFTA TAA Confidential Data Request Questionnaire to Barry Callebaut.   Ultimately, Labor relied upon the company's unverified questionnaire responses in denying the petitions for TAA and NAFTA TAA.  In its notice denying eligibility, Labor stated that the TAA claim failed to meet the criterion of an "increase[] of imports of articles like or directly competitive with articles produced by the firm or appropriate subdivision hav[ing] contributed importantly to the separations." Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 64 Fed. Reg. 72,690, 72,691 (Dep't Labor Dec. 28, 1999). Labor also stated that the NAFTA TAA claim was denied because "[i]mports from Canada or Mexico did not contribute importantly to workers' separations. There was no shift in production from the subject firm to Canada or Mexico during the relevant period." Notice of Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 65 Fed. Reg. 5,690, 5,691 (Dept' Labor Feb. 4, 2000).

However, upon the request of individual former employee Robert Bloom, Labor reconsidered its negative determination and initiated a second investigation, requesting additional information from Barry Callebaut's Human Resources Manager. See Barry Callebaut, USA, Incorporated Van Leer Division Jersey City, New Jersey; Notice of Affirmative Determination Regarding Application for Reconsideration, 65 Fed. Reg. 5,690 (Dep't Labor Feb. 4, 2000). Labor again denied the Plaintiffs' claims, relying on the unverified response of Barry Callebaut's Human Resource Manager and stating that "[t]he company has responded that it expects to shift some production from Jersey City to Canada in the near future, but to date, no shift has occurred."  Barry Callebaut USA, Incorporated, Van Leer Division, Jersey City, New Jersey;

3

Notice of Negative Determination on Reconsideration ("Reconsideration Determination"), 65 Fed. Reg. 13,991 (Dep't Labor Mar. 15, 2000). As a result, Mr. Bloom filed suit on behalf of the Former Employees, which prompted Defendant to file a Motion for a Voluntary Remand "for the purpose of allowing the agency to conduct an additional investigation and to make a redetermination as to whether petitioners qualify for certification for" TAA and/or NAFTA TAA.

Labor then initiated a third investigation and requested detailed information from the Accounting Manager of Barry Callebaut, USA, Inc. regarding the organizational structure of the company; the products produced at the Jersey City plant; where production and machinery were shifted once the plant closed; sales, production and imports for each product produced; and the plant's major customers. Labor also asked the company to "provide comments or documentation that would contradict the Department's negative determination" as to worker eligibility. Supplemental Administrative Record Accompanying Labor's Remand Determination ("SAR1") at 4. Labor's request was forwarded to Ms. Isabelle Eysseric, the current Marketing Director and former Vice President of Finance for Barry Callebaut Canada, Inc. Defendant's Rebuttal Comments to Plaintiffs' Brief in Opposition to Defendant's Negative Determination After the Court's November 2, 2001 Remand ("Defendant's Rebuttal") at 3.[2] According to a chart she submitted, only [ a small amount ] of the Jersey City plant's production was transferred to the

---

[2] Labor also contacted Mr. Woody Forns, the former Chief Financial Officer for Van Leer and the company contact person listed on the original petition. See Remand Determination. By the time Labor contacted him in this third investigation, Mr. Forns had been separated from the company for "about two years." SAR1 at 51. The memorandum on the record memorializing the certifying officer's conversation with him states that Mr. Forns indicated that "only a small percentage" of chocolate and ingredient production from the Jersey City plant was transferred to Canada, but that the cocoa press and the production for which it is used "probably went to Canada". Id. Labor characterized the information provided by Mr. Forns as not new. Remand Determination.

plant at St. Hyacinthe, Quebec, Canada and that all other production was transferred to other domestic plants. SAR1 at 41.

Based upon the unverified information provided by Ms. Eysseric, Labor found that "[a] negligible amount of" production of products formerly produced at the plant "was shifted from the subject firm plant to Canada." Remand Determination at 18, 116. Labor also found that imports of chocolate liquor were negligible, purchases of chocolate cake increased but domestic production also increased significantly, and imports of cocoa butter accounted for a "negligible portion of the company's domestic needs." Id. Finally, Labor found that the "vast majority" of production of the finished chocolate items formerly produced at the Van Leer Plant "was shifted to other Barry Callebaut domestic locations." Id. As a result, Labor affirmed its previous determinations and denied the petitions for TAA and NAFTA TAA. Id.

On November 2, 2001 the court remanded the case to Labor to conduct a fourth investigation, based on its finding that Labor's continued denial of Plaintiffs' TAA and NAFTA TAA claims and its Remand Determination were unsupported by substantial evidence. See Barry Callebaut, 177 F. Supp. 2d at 1304. In particular, the court found the conclusions in Labor's Remand Determination were premised solely on unverified statements from Barry Callebaut personnel and lacked necessary foundation, stating:

> The Department's acceptance of the unverified information provided by [Barry Callebaut], despite the contradictory evidence presented, renders the [Voluntary] Remand Determination unsupported by substantial evidence. This matter is remanded to Labor for further investigation into the amount of production which was moved from Jersey City, New Jersey, USA to St. Hyacinthe, Quebec, Canada.

5

<u>Barry Callebaut</u>, 177 F. Supp. 2d at 1311. Secondly, the court questioned Labor's substantial reliance on the chart entitled "Ex-Van Leer Items--Allocation of Production Per Site Since Close of the Van Leer Factory," given that chart's apparent conflict with Barry Callebaut's 1999 Annual Report. In ordering Labor to conduct another investigation, the court provided the following instructions:

> Labor is instructed to conduct a competent and thorough investigation, and given the evidence that Barry Callebaut has been less than truthful in its responses to Labor questionnaires, the Department must verify the company's responses. Obtaining a sworn statement from the company official who prepares the responses to Labor's questions is not sufficient verification. Labor's failure to conduct an adequate investigation in accordance with these instructions will be taken as indicative that the Department does not care to perform its duties competently, and the court will not remand for a fifth investigation.

<u>Id.</u> at 1312-13.

As a result, the court is now presented with Labor's <u>Second Remand Determination</u>, in which Labor has again denied Plaintiffs' claims for TAA and NAFTA TAA. For the reasons set forth below, the court grants the Plaintiff's motion to certify the Employees' TAA and NAFTA TAA claims.

### III

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(d) (1994). This case is governed by 19 U.S.C. § 2272 (1994) and 19 U.S.C. § 2395 (1994). 19 U.S.C. § 2272 provides for separated workers to petition for TAA. 19 U.S.C. § 2272 (1994). 19 U.S.C. § 2395 provides for the petitioning by displaced workers for NAFTA TAA and judicial review of Labor's determination

on such petitions. 19 U.S.C. § 2395 (1994). That section also provides that the court, "for good cause shown . . . may remand the case to [Labor] to take further evidence." Id. "Good cause exists if the Secretary's chosen methodology is so marred that his finding is arbitrary or of such a nature that it could not be based on substantial evidence." Former Employees of Linden Apparel Corp. v. United States, 13 CIT 467, 469, 715 F. Supp 378, 381 (CIT 1989) (citations and internal punctuation omitted).

"A negative determination by the Secretary of Labor denying certification of eligibility for [TAA] will be upheld if it is supported by substantial evidence on the record and is otherwise in accordance with law." Former Employees of Swiss Indus. Abrasives v. United States, 17 CIT 945, 947, 830 F. Supp 637, 639 (1993); see also 19 U.S.C. § 2395(b). Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion. Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

The Supreme Court in Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206 (1938), stated that language within administrative statutes which relax the rules of evidence applicable to U.S. district courts is designed to "free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order." Id. at 229, at 217 (citations omitted). However, the Court added, "this assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force." Id. (emphasis added). That Consolidated Edison Language has evolved, as

counsel for Labor agreed at oral argument, into a requirement that administrative agencies may not consider information unless it "bear[s] satisfactory indicia of reliability." See Echostar Communications Corp. v. FCC, 292 F.3d 749 (D.C. Cir. 2002) (quoting Crawford v. United States Dep't of Agric., 50 F.3d 46, 49 (D.C. Cir.1995)).[3]

# IV

# ANALYSIS

## A

**Although Labor has Acquired Additional Statements and Documentation, these Statements Lack Necessary Foundation and Labor's Conclusions are Not Supported by Substantial Evidence**

Although Labor has acquired contemporaneous documentation of the subject production shift in its Second Remand Determination, its heavy reliance on unsworn and unverified statements by Barry Callebaut personnel render its conclusions unsupported by substantial evidence. As part of its fourth investigation, Labor asked Barry Callebaut to provide the following:

---

[3] Cf. Johnson v. United States, 628 f.2d 187, 202 (D.C. Cir.1980), Hoska v. United States Dept. Of the Army, 677 F.2d 131 (D.C. Cir. 1982) (Unsworn, unverified, and conclusory psychiatric report did not constitute substantial evidence where contested by direct testimony); Richardson v. Perales, 402 U.S. 389, 407, 91 S.Ct. 1420 (1971) (Court concluded that unsworn doctors' examination reports, though contradicted by direct medical testimony, constituted substantial evidence for agency denial of disability insurance under the Social Security Act), which hold generally that evidence inadmissable in a federal court under the Federal rules of Evidence, such as hearsay, see F.R.E. 802, may be received in administrative hearings when the underlying information appears truthful, reasonable, and credible.

(1) Dates and corresponding product transfer documents, including the quantity and value of each product transferred from Jersey City, New Jersey and its destination location.

(2) Dates and corresponding machinery transfer documents, including a description of what was produced on that machinery in Jersey City, New Jersey, where the machinery was transferred to, and what it was used to produce after the transfer.

(3) The number of worker layoffs and date of separations at Jersey City, New Jersey, associated with (1) or (2).

(4) . . . the date the last article was produced at the Jersey City plant?

(5) Describe how the shifts in production from the Barry Callebaut, Jersey City, New Jersey plant in the chart entitled "Ex-Van Leer items--Allocation of Production Per Site Since the Close of Van Leer Factory" is accounted for in relation to what was reported in the Barry Callebaut 1999 Annual Report. When was that report published?

(6) And, any other relevant documents that will assist the U.S. Department of Labor in its investigation.

Supplemental Administrative Record following the court's November 2, 2001 Order ("SAR2") at 1-2. In response, Barry Callebaut provided additional statements by Ms. Eysseric, Ms. Jacquie Dragon, Barry Callebaut's Human Resource Director since January 1, 2002, and Mr. John Lynch, Barry Callebaut's Controller since March 2000. In addition, each statement is accompanied by a small array of documentation not present in Labor's voluntary remand determination. Labor's Second Remand Determination is largely based on these items. The court notes that the three statements are not sworn or notarized, and technically fail to satisfy the requirements of 28 U.S.C. § 1746 (2002).[4] In addition, upon examination, it is clear that the new documents, like

---

[4] 28 U.S.C. § 1746, entitled "Unsworn declarations under penalty of perjury," provides:

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be

the unverified statements that plagued Labor's voluntary remand determination, are unverified

and present summary data without any ascertainable foundation.

The court also notes that Labor's subpoena powers were not employed to acquire more

reliable testimony. Indeed, during oral argument, when asked if Labor has subpoena powers in

this kind of investigation, counsel for Labor stated "not that I am aware of in a cases such as this.

This is an administrative case, I'm not aware that they would be able to subpoena an employee of

Barry Callebaut or bring them in for a deposition with respect to this. I may be wrong here, truth

---

supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

(Signature)".

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

However, the three statements all conclude with the following paragraph:

I certify that the information set forth herein is true and correct to the best of my knowledge, information and belief. I am aware that if any of the information contained herein is willfully false, I am subject to punishment.

See Certifications of Isabelle Eysseric, John Lynch and Jaquie Dragon.

be told, but I'm not certain. I'd be surprised if that were the case." Contrary to counsel's belief, 19 U.S.C.S. § 2321 (2002) does provide the Secretary with subpoena powers in conducting TAA investigations.[5]

## 1

## Labor's Continued Reliance on the Ex-Van Leer Chart is Not Warranted Given the Chart's Own Unverified Summary Nature, its Incomplete Time Frame, and the Fact that Barry Callebaut's 1999 Annual Report Continues to Undermine the Ex-Van Leer Chart's Figures

In responding to Labor's questionnaire on February 26, 2001, Barry Callebaut submitted a chart titled "Ex-Van Leer Items – Allocation of Production Per Site Since the Close of Van Leer Factory." ("Ex-Van Leer Chart"). The chart, which covers the period of April 17, 2000 to January 27, 2001, lists four factories as producing 100% of the former Van Leer volume. The factories and their production percentages are stated as follows:

St. Hyacinthe, Quebec, Canada – [ a small amount ]
St. Albans, Vermont, USA – [ a larger amount ]
Pennsauken, New Jersey, USA – [ the largest amount ]
Piscataway, New Jersey, USA – [ a small amount ]

---

[5] 19 U.S.C. § 2321, entitled "Subpoena power," provides:

(a) Subpoena by Secretary. The Secretary may require by subpena the attendance of witnesses and the production of evidence necessary for him to make a determination under the provisions of this chapter [19 USCS §§ 2271 et seq.].

(b) Court order. If a person refuses to obey a subpena issued under subsection (a), a United States district court within the jurisdiction of which the relevant proceeding under this chapter [19 USCS §§ 2271 et seq.] is conducted may, upon petition by the Secretary, issue an order requiring compliance with such subpoena.

SAR1 at 41. Accordingly, Labor concluded that production of only a "negligible amount" of the articles produced at the Jersey City plant was moved to Canada in the Remand Determination. Remand Determination at 18, 116. The chart expressly states that the production shifted to Canada is [ a small amount ], which given the court's finding that the *de minimus* rule applies to the NAFTA TAA program, supports Labor's denial.

In its Second Remand Determination, Labor again relies heavily on the Ex-Van Leer Chart to substantiate its conclusion that a negligible amount of the Van Leer Plant's production was shifted to Canada, but does not adequately address its evidentiary shortcomings. The report does not delineate production at the included plants prior to April of 2000 or prior to the closing of the plant. Its summary nature provides no insight as to how the figures included within were derived. Labor dismisses the chart's summary nature and says supporting documentation for the Ex-Van Leer Chart is unnecessary "[s]ince virtually every product is unique and manufactured according to customer specification, the company was able to extrapolate by product code the volume and value of each of Jersey City product's [sic] and where the products were transferred." Second Remand Determination at 66. This claim is unsupported, given Labor's failure to cite to any Barry Callebaut personnel or documentation that reflects or supports this proposition. As a result, the Ex-Van Leer Chart cannot legitimately be the sole basis of Labor's conclusions.

However, even if the above infirmities were absent, the Ex-Van Leer Chart is severely undermined by the implications of Barry Callebaut's 1999 Annual Report. See 1999 Annual Report ("Annual Report"). The court previously found that the Annual Report implies that far

12

more than [ a small amount ] of Van Leer production was moved from Jersey City to Canada. Barry Callebaut, 177 F. Supp. 2d at 1310. The Letter From the Management accompanying the Annual Report notes changes made to increase efficiency and states "[a]n example of efficiency improvements within our Group is the transfer of the higher cost Van Leer U.S. production to more cost-efficient sites in Pennsauken (USA) and St. Hyacinthe (Canada). As a result, the Van Leer factory has been closed." Annual Report at 9. The fact that the St. Hyacinthe plant was expressly mentioned as one of two recipients of the Van Leer Plant's former production suggests that a substantial portion of the Van Leer Plant's production was shifted to Canada. The court summarized the apparent contradiction of the Ex-Van Leer Chart as follows:

> If the Pennsauken plant took over [the bulk] of the Jersey City plant's production, and St. Albans took over [an additional amount greater than St. Hyacinthe], then the question arises, why does the Annual Report list St. Hyacinthe, with only [a very small percentage] of the production, and not St. Albans? The statement in the Annual Report appears intended to show where the production has gone once the Jersey City plant closed. The fact that the company listed St. Hyacinthe implies that it and the Pennsauken plant took over the major portion of production. If indeed the St. Hyacinthe plant only took over [a very small percentage] of production, and the St. Albans plant took over [a greater percentage than St. Hyacinthe], it would seem only logical that the Annual Report would list St. Albans and not St. Hyacinthe. Alternatively, the Annual Report would list all four plants. In any case, the apparent discrepancy between the Annual Report and the submission to Labor suggests that the company was less than truthful in its submission.

Barry Callebaut, 177 F. Supp. 2d at 1310 (footnotes omitted).

Despite this backdrop, Labor concluded without further inquiry that the Annual Report does not undermine the Ex-Van Leer Chart's figures based on Ms. Eysseric's characterization of the report. With regard to the Annual Report, Ms. Eysseric states:

> [T]he Annual Report was not intended to be, nor did it purport to be, an exhaustive recitation of the business operations of each Callebaut entity or

13

facility. The "Letter from Management" contained in that Annual Report simply noted, by way of illustration, facilities to which Jersey City production has been transferred. Th[e] Letter and Report were drafted and published in 1999, before the Jersey City closure, and, thus, before most of the production had been transferred elsewhere–indeed, before the final decision had been made as to how the Jersey City's production would be allocated among Callebaut's other plants.

SAR2 at 8. On this basis alone, "[l]abor concluded that Barry Callebaut had sufficiently addressed the issue regarding the Annual Report by confirming that the annual report stating [sic] that was not an exhaustive recitation of the business operations related to the shutdown and that it was published prior to the actual closure of the Jersey City plant." Defendant's Rebuttal at 6 (citing SAR2 at 65-66).

Labor's summary investigation and conclusions regarding the apparent conflict between the Ex-Van Leer Chart and the Annual Report are entirely unsupported in the record. In its remand opinion, the court specifically instructed Labor "to conduct a competent and thorough investigation, and given the evidence that Barry Callebaut has been less than truthful in its responses to Labor questionnaires, the Department must verify the company's responses. **Obtaining a sworn statement from the company official who prepares the responses to Labor's questions is not sufficient verification.**" Barry Callebaut, 177 F. Supp. 2d at 1312-13 (emphasis added). The negative implication the Annual Report creates regarding the veracity of Barry Callebaut's personnel and the Ex-Van Leer Chart cannot be countered simply by denigrating its import in a new Eysseric statement. This is precisely what the court warned Labor would be inadequate to the task at hand. Moreover, the court notes that nowhere in the Annual Report is there any indication that its figures are merely for illustrative purposes.

14

As a result, the court finds that Labor's determination is not supported by substantial evidence. Labor's continued reliance on Ms. Eysseric's statement does not address the court's previous finding that the Annual Report contradicts the figures in the Ex-Van Leer Chart. Hence, to the extent they are based on the Ex-Van Leer Chart, Labor's conclusions are unsupported by substantial evidence.

## 2

## The Additional Statements By Barry Callebaut Personnel Only Provide Unverifiable Commentary Regarding the Production Shift and Do Not Substantiate Labor's Conclusions

Although the statements of Mr. Lynch, Ms. Dragon, and Ms. Eysseric purport to provide greater insight into the nature and scope of the production shift at issue, they, in fact, only provide unverifiable general statements without evidentiary foundation. Therefore, these statements do not support Labor's conclusions directly nor do they support the Ex-Van Leer Chart's figures. Since Labor's Second Remand Determination is founded almost entirely on the Ex-Van Leer Chart in conjunction with these statements, it is unsupported by substantial evidence.

**a**

**Ms. Eysseric's Statement and Supporting Documents Do Not Support the Ex-Van Leer Chart's Figures**

In addition to her characterization of the Annual Report, Ms. Eysseric provides several charts that presumably are intended to support the Ex-Van Leer Chart by illustrating the assortment of products that were produced at the Van Leer Plant and are now produced elsewhere.  See Exhibits A, B, C, D, and E to Certification of Ms. Isabelle Eysseric.  Exhibits A-D provide a breakdown of the products shifted from the Van Leer Plant to other plants, including the St. Hyacinthe, Canada plant, see Exhibit A, the St. Albans, Vermont plant, see Exhibit B, the Pennsauken, New Jersey plant, see Exhibit C, and the Piscataway, New Jersey plant, see Exhibit D.  Finally, Exhibit E is simply a copy of the Ex-Van Leer Chart and "reflects that [ the largest percentage ] of the Jersey City facility's production (by volume) was transferred to [Barry Callebaut] US's facility in Pennsauken, New Jersey, that [ a larger percentage ] of the Jersey City facility's production was transferred to [Barry Callebaut] US's St. Albans, Vermont plant, and [ a small percentage ] of the Jersey City facility's production was transferred to [Barry Callebaut] US's Piscataway, New Jersey plant." Certification of Ms. Eysseric at 3; see also Exhibit E.

Labor's  reliance solely upon these documents and the Ex-Van Leer Chart is unwarranted given their incomplete time frame.  According to Ms. Eysseric, the documents only "reflect the time frame of April 17, 2000 through January 27, 2001." Certification of Ms. Isabelle Eysseric at 2.  Ms. Eysseric asserts that "[a]lthough the Jersey City facility ceased production in [ date ], Callebaut changed its product tracking system in [ date ], making the information reflected in these exhibits much more accessible.  It would be extremely difficult, if not impossible, to

16

assemble this information for any period prior to the system being implemented." Id. at 2-3. Without any further documentation or support, Ms. Eysseric's claim that two year old macro production figures for a publically traded company are "extremely difficult, if not impossible" is entirely unsubstantiated. In addition, Labor apparently did not even verify whether Barry Callebaut was publically traded, as evidenced by counsel for Labor's statements during oral argument. When asked if Barry Callebaut is publically traded, counsel replied "They issue a letter to management and an annual report, that doesn't necessarily mean they are publically traded . . . . They're not publically traded, I don't think so . . . . I don't believe they are publically traded your honor." Labor's belief is incorrect. According to Barry Callebaut's own website, it has been listed since 1998 on the Swiss Stock Exchange.[6]

As a result, Labor's failure to probe deeper into the company's records is unjustified. This is especially so, given the fact the relevant time frame for this investigation extends beyond the actual shut down of the Van Leer Plant, and may stretch as far back as Spring 1999, when Barry Callebaut began laying off its Van Leer employees. See Labor's March 4, 2002 Memorandum to File, SAR2 at 62-63; Barry Callebaut, 177 F. Supp. 2d at 1306.

In addition, Labor's heavy reliance upon these documents is unwarranted given that they lack crucial information necessary to support the Ex-Van Leer Chart's figures. For example, Ms. Eysseric provides no explanation in her statement as to *how* the attached exhibits support the Ex-

---

[6] "Barry Callebaut AG (ticker symbol: BARN) has been listed on the Swiss Stock Exchange since June 1998. Our purpose is to provide relevant and timely information. Here you can find financial information about the company and monitor its share price." See <http://www.barry-callebaut.com/Main/fs_main.asp?reference=01-01.05-01&lang=EN&site=1&sess=145613944>.

Van Leer Chart. Although Ms. Eysseric explains the meaning of the charts' various column headings, the Plaintiffs correctly point out that "conspicuously absent from the statement is any reference to how these documents correlate to, or support, the quantities shown on the [Ex-Van Leer Chart]. In fact, Exhibits A-D to Ms. Eysseric's statement, while listing individual products said to have been transferred to the various plants, show no quantities or values for the products listed." Plaintiffs' Brief in Opposition to Defendant's Negative Determination after the Court's November 2, 2001 Remand ("Plaintiffs' Brief") at 5. As a result, the Ex-Van Leer Chart's summary figures remain entirely unverified and Labor should have probed Barry Callebaut's records further to obtain such verification, but failed to do so.

**b**

## Mr. Lynch's Statement Makes Unsubstantiated Claims Regarding the Character and Scope of Production Shifted from the Van Leer Plant

Although upon cursory examination, Mr. Lynch's statement suggests that the Ex-Van Leer Chart figures are accurate, it lacks any numerical or evidentiary foundation and is too general to support any conclusions regarding what production was shifted to Canada. Mr. Lynch's statement is intended to demonstrate the [ plant ] produced a specialized mixture of products that was largely duplicated at [ another plant ], while only the negligible remainder of liquid chocolate production was shifted to the St. Hyacinthe, Canada plant.

Mr. Lynch, among other things, asserts: 1) [ the first plant's ] production was devoted primarily to artificial chocolate or compound products;[7] 2) that "the approximate value of [the machinery and equipment transferred from [ the first plant ] to other plants] . . . does not and cannot reflect the transfer of production for the plants involved," because such equipment "can be used to produce a wide range of products;" 3) the "vast majority" of [ the first plant's ] production was transferred to the [ second plant ], which had significant excess capacity; 4) the St. Hyacinthe, Canada plant chiefly produces "real" chocolate and took over the negligible liquid chocolate production [ from the first plant ]. Certification of John Lynch at 2-4.

However, Mr. Lynch merely relies on emphatic language without any numerical foundation. The following breakdown illustrates this practice:

- With regard to the scope and character of the Van Leer Plant's production prior to closure, Mr. Lynch states 1) [ a plant ] **"chiefly** produced products for the United States commercial ice cream and frozen dessert market." Id. at Paragraph 3 (emphasis added); 2) [ another plant ] "produced **most** of Van Leer's other products, such as soft chunks and freezcote." Id. at Paragraph 4; 3) "**Most** of the items produced by the [ other plant ]. . . were artificial chocolate or (compound) products." Id. (emphasis added).

- With regard to the scope and character of the other plants's production prior to and following acquisition, Mr. Lynch states 1) [ the plant ] "**chiefly** produced panned products and [Barry Callebaut] US continues to operate that site today with essentially no change in product mix since the acquisition." Id. at Paragraph 3 (emphasis added); 2) [ the plant ] has **chiefly** produced compound products."Id. at Paragraph 5; 3) "[ the plant ] also has produced **some** 'gourmet' chocolate and white chocolate and white compound products." Id. (emphasis added).

- With regard to the scope and character of the production shift, Mr. Lynch states 1) "[T]he **vast majority** of [ the plant ] compound production was moved to [ another plant ]." Id.

---

[7] "(Compound) or artificial chocolate products substitute certain types of vegetable fats and cocoa powder for cocoa butter in the production process. Most of the items produced by the [ plant ], such as soft chunks and freezecote, were artificial chocolate or 'compound' products." Certification of John Lynch at 2.

19

at Paragraph 7 (emphasis added); 2) "**Most** of the liquid production is now in Saint Hyacinthe." Id. (emphasis added).

This complete dearth of numbers frustrates the entire purpose of Labor's investigation. Labor is tasked with determining whether a legally significant percentage of the Van Leer Plant's production was shifted to Canada. Therefore, by definition, the heart of this investigation is numerically driven. The various plant attributes and production mixes that Mr. Lynch discusses are undoubtedly significant and should factor prominently into Labor's analysis. However, they cannot support any real conclusion if they are conveyed in entirely verbal terms, which can imply a variety of numerical possibilities.[8] As a result, Mr. Lynch's statement does not lend credible support to the Ex-Van Leer Chart.

Finally, Mr. Lynch's attempt to qualify the fact that [ some ] of the Van Leer Plant's equipment was transferred to the St. Hyacinthe, Canada plant, see SAR1 at 48, fails. Although Mr. Lynch stresses that the transferred equipment was "generic" in nature and could be used to produce various chocolate products, he does not offer any indication how such equipment was

---

[8] Plaintiffs illustrate the inconclusive nature of Mr. Lynch's statement through this example:

> Assume Jersey City's total production was 100 lbs. of chocolate broken down as follows: 70 lbs. of compound and 30 lbs. of real chocolate (i.e., "{most}" production is compound production.) If 90% (presumably sufficing as a "{vast majority}") of the compound production, or 63 lbs., shifted to Pennsauken, then 37 lbs. (or 37% of the total production) would shift elsewhere. If "{most}" of that 37% went to Canada, the production shift to Canada would not be insignificant.

Plaintiffs' Brief at 9.

20

*actually* put to use.[9]  As such, the court is unable to determine whether in fact this equipment is being used to "produce the same, like, or directly competitive chocolate products," Plaintiff's Brief at 11 (citing 19 U.S.C. § 2272 (TAA) and 19 U.S.C. § 2395 (NAFTA TAA)), which is one fundamental question in this matter.  As a result, Mr. Lynch's assurances are unpersuasive.

Labor has failed to verify any of Mr. Lynch's characterizations either with corresponding statements from other Barry Callebaut personnel or with any supporting documentation.  As a result, Mr. Lynch's statement cannot support Labor's <u>Second Remand Determination</u>.

**c**

**Jaquie Dragon's Statement Does Not Provide Any Certainty With Regard to the Number of Workers Affected**

Ms. Dragon's statement purports to quantify the workers affected by the closure of the Van Leer Plant and the applicable time frame.  Ms. Dragon's asserts that terminations primarily took place from January 2000 to March 2000 and provides a spreadsheet in support.

---

[9] Rather, Mr. Lynch includes an exhibit to his statement that purports to provide a "*complete* listing of the [ plant ] assets acquired by [Barry Callebaut] US and of their ultimate disposal." Certification of John Lynch at 6 (emphasis in original).  In addition, Mr. Lynch states that "[a]lmost [ half ] of equipment transferred to Saint-Hyacinthe is reflected in the conching equipment (under Item No. 900,025), a machine which is used to 'temper' real chocolate and which can be used to produce *any* type of chocolate." <u>Id.</u> at 4 (emphasis added).  However, neither item illustrates how the generic equipment was actually put to use.  If this equipment, including the conching equipment, can truly be used to produce any kind of chocolate, Labor should have at least inquired into the possibility that such equipment was being used to produce chocolate of the type formerly produced at the Van Leer plant.

21

Her figures apparently contradict her prior statements reflected in Labor's internal memoranda. Labor's March 4, 2002 memorandum to file concerning its fourth investigation indicates "that based on the information [Ms. Dragon] provided, the terminations began on July 16, 1999 through June 30, 2000. The terminations from July 16, 1999 through December 30, 1999 accounted for 18.3% . . . of the total . . . . [t]hat is 81.7% . . . of the workers were terminated from January 1, 2000 through June 30, 2000." SAR2 at 62-63. Despite this contradiction, there was no further inquiry by Labor.

In addition, Labor's estimate of the number of workers affected has changed among the four investigations, also calling into question the accuracy of Ms. Dragon's figures. During the first two investigations, the number stood at 144, Initial Confidential Administrative Record at 21, however as of the Remand Determination that number changed to 56, SAR1 at 48, and finally, the current figure stands at 82, SAR2 at 58-60. Indeed, three of the Plaintiffs who filed the original TAA and NAFTA TAA claims, Carlos Figueroa, Alberto Torres, and Miguel Flores, see Plaintiff's Brief at 13, fn. 12, are not included on Ms. Dragon's spreadsheet. Their absence is unexplained.

These discrepancies should have prompted Labor to further verify the accuracy of the various figures it was given. However, there is no indication that Labor did so. Hence, Ms. Dragon's statement does not provide sufficient foundation for Labor's conclusions.

# V

## CONCLUSION

Labor relies on four key items of evidence, the Ex-Van Leer chart, Ms. Eysseric's statement, Mr. Lynch's statement, and Ms. Dragon's statement. Labor asserts that the statements, taken together, support the figures within the Ex-Van Leer Chart, and thus its ultimate conclusion that a negligible amount of production was transferred from the Van Leer Plant to Canada. However, given the court's previous finding that the Ex-Van Leer Chart is unreliable, these statements do not supply evidence necessary to support Labor's conclusions. The internal contradiction between company documents cannot be extinguished or explained solely by assurances of Barry Callebaut's executives contained in the statements, which are unsworn, conclusory, and factually lacking; they simply do not "bear satisfactory indicia of reliability" to support Labor's conclusions. Labor adopted the executives' statements and their characterizations at face value, despite their internal contradictions and despite having the opportunity to employ subpoena powers to obtain more reliable testimony.

Ms. Eysseric's statement is conclusory and provides nothing other than her personal assurance that the Annual Report should be discounted due to what she alleges is its merely illustrative nature. Ms. Eysseric submitted no documentation, materials, or other testimony to corroborate this assertion. Hence, her unsworn statement characterizing the Annual Report as an illustration or projection serves as the sole basis for Labor's discounting it. Morever, her assertions regarding the alleged difficulty to acquire production figures prior to April 2001, and the alleged insignificance of the Annual Report are undermined by the fact the Barry Callebaut is publically traded, a fundamental fact into which Labor failed to even inquire.

Second, Mr. Lynch's language though emphatic, provides no real foundation for the Ex-Van Leer Chart. Indeed, Mr. Lynch's statement is devoid of any concrete figures that can support any distinct conclusion, which should have prompted Labor to fill that void. Rather, Labor simply adopted the position that this statement probably supports its conclusions, despite the lack of any factual basis.

Finally, Ms. Dragon's statement and attached spreadsheet appear to conflict with Labor's internal memoranda. Moreover, Ms. Dragon's spreadsheet fails to account for three of the original plaintiffs in this action. Indeed, given the glaring nature of these inconsistencies, Labor should have been prompted to further scrutinize and verify all three statements. It failed to do so.

The court is guided by the decision in <u>Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor</u>, 17 CIT 126, 814 F. Supp. 1111 (1993). In that case, Labor conducted three investigations on the petitions for trade adjustment assistance. The court found that all three investigations were inadequate. Ultimately, the court ordered the Secretary to certify the workers, stating that "Labor has repeatedly ignored the Court's instructions to conduct a more thorough investigation. After three tries the record continues to be scant and Labor has once again failed to substantiate its conclusions. Thus, ordering another remand in this case would be futile." <u>Hawkins Oil</u>, 17 CIT at 130, 814 F. Supp. at 1115. In this respect, this case strongly parallels <u>Hawkins Oil</u>.

Ordering the Secretary to certify the Plaintiffs' claims is within the court's discretion. The court has declared that determinations based on inadequate investigations are not afforded deference. <u>Former Employees of Gen. Elec. Corp. v. U.S. Department of Labor</u>, 14 CIT 608 (1990); <u>United Elec., Radio & Mach, Workers of Amer. v. Dole</u>, 14 CIT 818 (1990). These

24

cases make clear that although Labor has significant discretion in conducting trade adjustment assistance investigations, a reasonable inquiry is still a minimum requirement. Moreover, the court may order the Secretary to certify the entire plant. See United Elec., Radio and Machine Workers of Amer. v. Martin, 15 CIT 299, 308 (1991). Finally, 19 U.S.C. § 2395(c) states the "Court of International Trade shall have jurisdiction to affirm the action of the Secretary of Labor . . . or to set such action aside, in whole or in part."

Labor is the agency tasked with properly overseeing and addressing TAA and NAFTA TAA claims. When Labor is presented with a petition for trade adjustment assistance, it has an affirmative duty to investigate whether petitioners are members of a group which Congress intended to benefit from the legislation. Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987); Cherlin v. Donovan, 7 CIT 158, 162, 585 F. Supp. 644, 647 (1984). Labor's inadequate efforts have failed to produce a determination that meets minimum legal standards. Having failed to conduct an adequate investigation after four opportunities, Labor will not receive another. The Secretary must certify the former employees in this case and grant their applications for TAA and NAFTA TAA.

 

 

_____
Evan J. Wallach, Judge

Date: August 30, 2002
      New York, New York