T.C. Memo. 2021-130

UNITED STATES TAX COURT

HERMAN J. MARINO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7671-18W.                    Filed November 22, 2021.

P claimed an award under I.R.C. sec. 7623(b)(1) for
information alleging violations of income tax laws by a subchapter
S corporation (S Corp) and its shareholders.  R initiated administrative
action on the basis of P's information, including audits conducted by
Revenue Agent DB of the 2012 and 2013 returns filed by S Corp's
majority shareholder, TP1, and the 2012 return filed by his daughter,
TP3.  The audits of the returns of TP1, who died in 2015, reduced
reported net operating losses (NOLs).  In a supplemental claim, P
alleged that TP1 had failed to pay gift tax on a gift made to TP3 in
either 1983 or 1993.  On the premise that the issue raised in P's
supplemental claim had been addressed in DB's audit of TP3's 2012
return, LG, an analyst in the Whistleblower Office (WBO) of the
Internal Revenue Service (IRS), declined to refer that claim for
investigation.  R moved for summary judgment that the WBO had not
abused its discretion in denying P an award.  In response to orders of
the Court, R twice supplemented his motion.  With his second
supplement, R submitted a Form 4340, Certificate of Assessments,

[*2]   Payments, and Other Specified Matters, for each of TP1's 2014 and 2015 taxable years.

Held:  In evaluating a whistleblower's claim for an award, the WBO may consider evidence that would be inadmissible hearsay in a judicial proceeding and, in conducting a review under I.R.C. sec. 7623(b)(4), this Court must treat that evidence as supporting the WBO's determination if it finds the evidence reliable and trustworthy. See Crawford v. USDA, 50 F.3d 46, 49 (D.C. Cir. 1995).

Held, further, the administrative record does not establish that the adjustments made in the audits of TP1's 2012 and 2013 returns merely reduced NOL carryovers that expired with his death.

Held, further, evidence not included in the administrative record can nonetheless be considered in evaluating the consequences of remand to the WBO.

Held, further, because the Forms 4340 for TP1's 2014 and 2015 taxable years demonstrate that the IRS collected no proceeds in regard to those years, remand to the WBO "would be an idle and useless formality." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969).

Held, further, although the record does not establish the extent to which DB considered the possibility that TP1's losses from S Corp were limited by I.R.C. sec. 1366(d), we have no authority to oversee, and judge the adequacy of, any administrative actions undertaken in response to whistleblower claims. See, e.g., Cohen v. Commissioner, 139 T.C. 299, 302 (2012), aff'd, 550 F. App'x 10 (D.C. Cir. 2014).

Held, further, we have no jurisdiction to review LG's decision not to seek investigation of P's supplemental claim. Lacey v. Commissioner, 153 T.C. 146, 164 (2019), followed.

[*3]   <u>Herman J. Marino</u>, pro se.

<u>Gregory Becker</u>, <u>George W. Bezold</u>, and <u>Timothy A. Lohrstorfer</u>, for respondent.


MEMORANDUM OPINION


HALPERN, <u>Judge</u>:  Petitioner brought this action under section 7623(b)(4) asking that we review the denial by the Whistleblower Office (WBO) of the Internal Revenue Service (IRS) of his claim for an award.[1]  In May 2019, respondent moved "for summary judgment in * * * [his] favor on the issue of whether * * * [he] abused his discretion in denying petitioner's claim for a whistleblower award."  In support of his motion, respondent submitted a declaration of Lev Glikman, a senior tax analyst in the WBO, and accompanying exhibits.  In March 2021, in response to an order of the Court, respondent submitted an amendment and supplement to Mr. Glikman's declaration.  Among other things, Mr. Glikman's amended and supplemented declaration states that the exhibits attached to his original declaration constitute the administrative record that

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[*4] the WBO considered in evaluating petitioner's claim.  In June 2021, again in response to an order of the Court, respondent submitted a second supplement to his motion for summary judgment.  For the reasons explained below, we will grant respondent's motion, as supplemented.

Background

Petitioner's Initial Claim

In a Form 211, Application for Award for Original Information, dated January 7, 2014, petitioner claimed an award for information regarding alleged violations of income tax laws by a subchapter S corporation and its shareholders.  Among other things, petitioner claimed the S corporation had overstated its cost of goods sold and improperly deducted payments, ostensibly for marketing rights, made to "Taxpayer 3".  Taxpayer 3 was a minority shareholder of the S corporation who owned 15% of the corporation's stock.  Her father, "Taxpayer 1", owned the remaining 85% of the stock.

WBO's Referral for Investigation

In a memorandum dated March 20, 2014, Mr. Glikman referred petitioner's claim for investigation.  In that memorandum, Mr. Glikman observed that "[o]ne of the alleged issues is lack of stock basis on the part of the S corp. * * * shareholders

**[*5]** * * * thus preventing them from deducting flow-through losses on their individual returns."

Audit Activity

After Mr. Glikman referred the case to the IRS Small Business/Self-Employed Division (SB/SE), Revenue Agent Ari Grellas interviewed petitioner. Mr. Grellas prepared a memorandum describing that interview for Ed Barfels, SB/SE's subject matter expert. In that memorandum, dated June 3, 2014, Mr. Grellas acknowledged petitioner's claim "that shareholders have no S-corporation basis for the deduction of losses from Corporation." Mr. Grellas noted that petitioner had provided "no evidence to support the fact that shareholders did or did not have adequate basis in the S-corporation." He added:

> It appears as if the loan from * * * [Taxpayer 1] to Corporation was converted to stock in 2003; however, there is a long term payable to * * * [a sole proprietorship of Taxpayer 1] included on the balance sheet for $2,962,291 in 2009 and $3,226,398 in 2010. It is unclear whether this amount has been increased because of accruals or outlays of cash from * * * [Taxpayer 1] to Corporation. However, a review of these related party transactions should be conducted.

In response to the information submitted, the IRS audited the S corporation's 2012 return, the 2012 returns of Taxpayer 1, his wife (Taxpayer 2), and Taxpayer 3, and Taxpayer 1's 2013 return.

[*6]   On March 6, 2015, Revenue Agent Dianna Beers prepared a Form 11369, Confidential Evaluation Report on Claim for Award, concerning her audit of Taxpayer 1's 2012 return.  Her report states:  "[A] change to the 2012 return resulted in the need to reduce a NOL [net operating loss] carry over to 2013.  It still did not change the tax liability of the taxpayer."

A Form 4549, Income Tax Examination Changes, lists the adjustments made to Taxpayer 1's returns for 2012 and 2013.  The adjustments made for 2012 total $820,908.  Taxpayer 1's return for the year reported taxable income of −1,344,338.  The adjustments reduced Taxpayer 1's loss for the year to $523,430.  An attachment to the Form 4549 states:  "Any unused NOLD [net operating loss deduction] is then allowed to be carried forward to the next year, in this case 2013, since TP made the election to forgo the carry back."

The only adjustment made for Taxpayer 1's 2013 taxable year was a reduction in Taxpayer 1's NOL carryforward of $861,706.  Taxpayer 1's return for 2013 reported a loss of $1,095,819.  The reduction of the loss carryforward from 2012 reduced Taxpayer 1's 2013 loss to $234,113.

Another Form 4549 lists the adjustments made to Taxpayer 2's 2012 return.  The adjustments include a $12,000 increase in wages and a $240 reduction in

[*7] itemized deductions. Taxpayer 2's 2012 return reported a loss of $15,032.

The $12,240 of adjustments reduced Taxpayer 2's 2012 loss to $2,792.

A Form 11369 Ms. Beers prepared regarding the audit of Taxpayer 3's 2012

return states: "The identification of the taxpayer resulted in no changes to the tax

return of the taxpayer. * * * The losses reported on the tax return of * * * [the

S corporation] were not taken on TP's return. Therefore, the changes to the

amount of loss resulted in no change to TP's return." Form 4549-A, Income Tax

Discrepancy Adjustments, regarding the audit of Taxpayer 3's 2012 return shows

total adjustments of zero. In that form, Ms. Beers noted:

> The S corporation suffered a large loss in 2012. TP apparently did not report the loss, either as passive or non-passive, on the return as it is not listed on the Schedule E. However, on the 2013 return, TP * * * reports non-passive income and a carry-over loss of $32,315 for the S corporation. The loss reported to TP on the 2012 Form K-1 is $200,287, far greater than the amount reported. It is unknown why the full amount was not reported and the preparer did not complete a Form 8582 for passive activity losses.

## Taxpayer 1's Reporting for 2014 and 2015

The record includes transcripts printed from respondent's Information Data

Retrieval System (IDRS) of Taxpayer 1's account for the 2014 and 2015 taxable years.

Each transcript is dated November 8, 2017. The transcript for Taxpayer 1's 2014

taxable year shows total income of −$730,987 and tax per taxpayer and total payments

[*8] of zero. The 2015 transcript shows total income of −$688,571 and, again, tax per taxpayer and total payments of zero.

The S Corporation's 2014 Amended Return

In July 2016, the S corporation filed an amended return for its 2014 taxable year. The S corporation's amended return reported an increase in cost of goods sold of $632,243 and a decrease in other income of $76,553, for a total reduction in taxable income of $708,796. The IRS audited the S corporation's amended return and accepted it as filed.

Mr. Glikman's Award Recommendation Memorandum

In an Award Recommendation Memorandum dated March 19, 2018, that Mr. Glikman prepared for Steven Mitzel, the WBO's program manager, case development and oversight, Mr. Glikman described as follows the results of the audits of the S corporation, Taxpayer 1, Taxpayer 2, and Taxpayer 3 (internal headings omitted):

> An audit of * * * [the S corporation's] 2012 return has been conducted.[2] There was an adjustment (reduction) of $916,879 made to Cost of Goods Sold. There was also an adjustment (reduction) of $34,505 made to Other Income * * * that should have been reported

---

[2]In his Award Recommendation Memorandum, Mr. Glikman employed different pseudonyms for the taxpayers from those respondent used in his motion for summary judgment. For consistency, we will use respondent's pseudonyms.

[*9] on its return.  The last adjustment (reduction) of $15,554 was made to Other Expenses * * * that should have been reported on its return.  Because * * * [the S corporation] had a $1.3M NOL in 2012, the adjustments reduced that NOL to $438,651 2012 loss.

\* \* \* \* \* \* \*

In July 2016 * * * [the S corporation] filed an amended return for 2014 to reduce its Cost of Goods Sold,[3] and it was referred to the Field for audit.  * * *  New RA has audited the amendment and accepted the 2014 amended return.  Thus, a reduction of $632,243 in the Cost of Goods Sold has been allowed together with a relatively small ($76,553) reduction in income.  The net result is a creation of a $464,798 NOL in 2014.  There is no tax effect on either * * * [Taxpayer 1] who is deceased or * * * [Taxpayer 3] who did not take a flow-through loss due to lack of basis.

[The S corporation's] 2012 adjustment have [sic] been carried over to * * * [Taxpayer 1's] 2012 return to reflect his flow-through distributive share.  Additionally, a number of other adjustments have been made to re-allocate various expenses between * * * [Taxpayer 1's] Sch. C and Sch. E and correct some entry and other errors.  The bottom line is that * * * [Taxpayer 1] had a $1.3M NOL in 2012 that has been reduced to a $523,430 2012 loss.

In 2013, since * * * [Taxpayer 1] has made an election to forgo an NOL carryback, his 2012 NOL, after 2012 audit adjustments, has been carried forward to 2013.  There were no other adjustments made in 2013.  2013 still resulted in a $234,113 loss.

[Taxpayer 1] died in August 2015.  His 2015 was the last return filed.  2014 and 2015 returns were filed with zero tax liability and show

---

[3]Contrary to Mr. Glikman's description, the S corporation's amended return reported an increase in cost of goods sold that had the effect of reducing its taxable income.

[*10]  large negative taxable income in each year.  As such, there are no current or future collected proceeds in regard to * * * [Taxpayer 1].

An audit of * * * [Taxpayer 2's] 2012 return has been conducted.  The only adjustment made was a $12,000 increase in her wages from * * * [the S corporation] that have been inadvertently left of [sic] the return.  Even after that adjustment, * * * [Taxpayer 2's] 2012 return had a $2,792 loss.

[Taxpayer 2] died in October 2015.  Her 2015 return was the last one filed.  2014 and 2015 returns were filed with minimal tax liability ($1,378 and $106, respectively).  Under these circumstances, it is not practical or beneficial to consider the impact of the $12,000 immaterial NOL reduction.  As such, there are no current or future collected proceeds in regard to * * * [Taxpayer 2].

An audit of * * * [Taxpayer 3's] 2012 return has been conducted.  It has resulted in a straight no-change.  The flow-through losses reported on * * * [the S corporation's] tax return have not been taken on * * * [Taxpayer 3's] return due to lack of basis.  * * *

[N]o other audits have been conducted.  It is CDO Analyst's strong opinion that no further audits are necessary considering all the circumstances described above. * * *

There are no collected proceeds as a result of four audits conducted on the four reported T/Ps.

Petitioner's Supplemental Claim

In a supplemental claim, submitted after the completion of the audit of

Taxpayer 3's 2012 return, petitioner named her as the target taxpayer, in her

capacity as executor of her father's estate.  Petitioner's supplemental claim alleges

that Taxpayer 3 had received as a gift from her father (Taxpayer 1) the intellectual

[*11] property in respect of which she received payments from the S corporation. According to petitioner, Taxpayer 1 was the inventor of that property. "Therefore," petitioner reasons, "the only way * * * [Taxpayer 3] could have acquired the Marketing Rights would have been by transfer from the inventor, her father * * * [Taxpayer 1]." He asserts that the transfer he deduced must have occurred "was clearly gratuitous, since * * * [Taxpayer 3] made no payment for the receipt of the Marketing Rights." Petitioner is inconsistent in identifying the date of the gift (variously, August 1, 1983, or August 1, 1993). He claims that the value of the property on each date was $11,500,000, so that gift tax was due on the transfer. And he was "advised" that Taxpayer 1 did not report the gift on a gift tax return.

A Form 11369 that Ms. Beers prepared in connection with the audit of Taxpayer 3's 2012 return states:

> Contrary to his statement, the marketing rights WB references do have a contract and agreement, which have been in effect for over 20 years, and have been accepted by the Service since inception. Even if the arrangement has the appearance of being a gift, the fact remains that the TP reports the full amount received and takes no deductions against the income. The marketing rights are reported as ordinary income. The Examining Revenue Agent discussed the case with the Group Manager and it was agreed that there was no reason to change anything on the marketing rights, as it would have no tax effect. In fact, the tax effect would likely be less than the Service already receives, as * * * [the S Corporation] would still have a loss if the marketing rights were not allowed as a deduction. Taxpayer has been

[*12] reporting the marketing rights as royalties the entire time she has been receiving them and the amount of the royalties puts her in the top income bracket. It was determined that there was no compelling reason to change the manner in which the marketing rights are being reported. Additionally, there is not a likelihood that, if the case were to go to court, that it would be upheld on the merits.

On the basis of Ms. Beers' report, Mr. Glikman wrote in his Award Recommendation Memorandum that "the audit has addressed th[e] issue [raised in petitioner's supplemental claim] and has determined that the marketing rights income that has been reported by * * * [Taxpayer 3] does not warrant an adjustment." "[B]ecause the issue that is the subject of the supplemental submission has already been audited and no-changed", Mr. Glikman explained, "no referral would be made to Gift/Estate Tax".

Hearing on Respondent's Motion for Summary Judgment

On March 30, 2021, we held a hearing concerning respondent's motion for summary judgment. At that hearing, respondent's counsel, George Bezold, advised us that his inquiries established that "the '14 and '15 returns of Taxpayer 1 were filed in late 2016, after his death".[4]

---

[4]Although Mr. Bezold's statement does not appear to be corroborated by the administrative record, it is supported by the Forms 4340, Certificate of Assessments, Payments, and Other Specified Matters, for Taxpayer 1's 2014 and

**[\*13]** <u>Updated Certificates for Taxpayer 1's 2014 and 2015 Taxable Years</u>

The certificates respondent submitted with his second supplement to his motion for summary judgment show the status of Taxpayer 1's account for each of 2014 and 2015 as of May 4, 2021. Each certificate shows the filing of a return on October 17, 2016, that reports adjusted gross income for the year in a negative amount. Neither certificate shows the assessment or collection of any tax for the taxable year.

Discussion

I.     <u>Introduction</u>

Section 7623(b)(1) requires the payment of an award to an individual (commonly referred to as a "whistleblower") who provides information concerning underpayments of tax if the Commissioner, on the basis of that information, "proceeds with any administrative or judicial action" that results in the collection of proceeds. Section 7623(b)(4) allows whistleblowers to appeal award determinations (including determinations not to grant an award) and gives this Court jurisdiction over those appeals.

We review WBO determinations under section 7623(b)(4) for abuse of discretion, and that review is generally limited to the administrative record.

---

2015 taxable years (certificates) that respondent submitted along with the second supplement to his motion for summary judgment.

**[\*14]** Kasper v. Commissioner, 150 T.C. 8, 14-23 (2018).  As we explained in Van Bemmelen v. Commissioner, 155 T.C. 64, 74 (2020):  "Absent a substantial showing made with clear evidence to the contrary, an agency is presumed to have properly designated the administrative record."[5]  Nonetheless, we allow supplementation of the administrative record to "includ[e] evidence that should have been properly a part of the administrative record but was excluded by the agency".  Id. at 73.  In limited circumstances, we will also consider "extrajudicial evidence that was not initially before the agency".  Id.  Considering extrarecord evidence, however, "is the exception, not the rule."  Id. at 76 (quoting Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 514 (D.C. Cir. 2010)).

In the present case, we consider respondent's motion for summary judgment. Summary judgment normally expedites litigation.  It is intended to avoid unnecessary and expensive trials.  It is not, however, a substitute for a trial and should not be used to resolve genuine disputes over issues of material facts.  E.g.,

---

[5]Petitioner contends that "[i]t is the obligation of the Commissioner to show that the administrative record is complete".  While petitioner "admits that there is a Tax Court Opinion designated Van Bemmelen v. Commissioner", he denies the existence of any presumption "as to the adequacy of the administrative record."  The quotation in the text from Van Bemmelen v. Commissioner, 155 T.C. 64, 74 (2020), demonstrates petitioner's error.

**[\*15]** <u>RERI Holdings I, LLC v. Commissioner</u>, 143 T.C. 41, 46-47 (2014). As a general rule, "[t]he party moving for summary judgment has the burden of demonstrating that no genuine issue as to material fact exists, and that he is entitled to judgment as a matter of law." <u>Casanova Co. v. Commissioner</u>, 87 T.C. 214, 217 (1986). Under Rule 121(d), a party opposing summary judgment "may not rest upon the mere allegations or denials" but must instead "set forth specific facts showing that there is a genuine dispute for trial."

The usual summary judgment standards provided in Rule 121 are "not generally apt where we must confine ourselves to the administrative record to decide whether there has been an abuse of discretion." <u>Van Bemmelen v. Commissioner</u>, 155 T.C. at 78. "In such a case involving review of final agency action * * *, summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." <u>Id.</u> at 79.

II. <u>The Parties' Arguments</u>

A. <u>Respondent</u>

In his motion for summary judgment, respondent explained his position as follows:

**[*16]**      In this case, there were undoubtedly actions initiated by respondent against the S corporation, Taxpayer 1, Taxpayer 2, and Taxpayer 3.  And these actions were initiated as a result of petitioner's information and adjustments made.

However, there were no collected proceeds from any of the taxpayers.  The S Corporation does not pay taxes, but rather, the tax liability flows-through [sic] to its S Shareholders.  Here, there was no tax, penalty, or interest collected from Taxpayer 1 from the audit initiated as a result of petitioner's information or at any other point during the remainder of his life.  The reduction in net operating loss that flowed-through [sic] to Taxpayer 1's individual return (and might ultimately have resulted in collected proceeds * * * ) were [sic] extinguished upon his death.  * * *  Likewise, there was no tax, penalty, or interest collected from Taxpayer 2.  With respect to Taxpayer 3, her examination resulted in a no-change.  In other words, there were no adjustments to income made to her tax return.  As a result, there were no proceeds collected from Taxpayer 3.

Because there were no proceeds collected from any of the taxpayers examined as a result of petitioner's information, respondent's Whistleblower Office did not abuse its discretion in denying petitioner's claim for an award.

Respondent is entitled to judgment as a matter of law because the Whistleblower Office did not abuse its discretion in denying petitioner's claim for award in a case in which no proceeds were collected.

B.      Petitioner

Petitioner objects to the granting of respondent's motion on several grounds.

First, petitioner argues that Mr. Glikman's declaration and at least some of the exhibits submitted with that declaration are inadmissible hearsay.

**[\*17]** Second, petitioner contends that "the documents in the Administrative Claim File are incomplete and insufficient to conclude whether no taxes, interest and penalties from Taxpayers 1, 2 and 3 were collected ass [sic] that term is defined by IRC Section 7623 as amended in 2018." In his response to respondent's motion for summary judgment, petitioner complained that "[n]o information is provided in the Administrative Claim File that would permit the Petitioner to conclude what the taxable income of Taxpayer 1 was these years [an apparent reference to 2014 and 2015]." In his response to respondent's second supplement to his motion for summary judgment, with which respondent submitted the May 2021 Forms 4340 for Taxpayer 1's 2014 and 2015 taxable years, petitioner complained that the supplement "does not address carrybacks available to Taxpayer 1 and does not show how or if the administrative record addressed this issue."[6]

Third, petitioner claims that the IDRS transcripts for Taxpayer 1's 2014 and 2015 taxable years "purport[] to show a liability due to the IRS, and thus potential 'collection proceeds' under IRS [sic] 7623."

---

[6]Under the law then in effect, in the absence of an election under sec. 172(b)(3), Taxpayer 1 would have been required to carry his 2012 NOL back to apply against his taxable income for 2010 and 2011. See sec. 172(b)(1)(A)(i).

[*18] Fourth, petitioner challenges respondent's reliance on our Opinions in Cooper v. Commissioner, 136 T.C. 597 (2011), and Cohen v. Commissioner, 139 T.C. 299 (2012), aff'd, 550 F. App'x 10 (D.C. Cir. 2014). In Cohen v. Commissioner, 139 T.C. at 302, we held: "A whistleblower award depends upon the Commissioner commencing an administrative or judicial action and collecting proceeds." Petitioner contends that respondent's "general statement of law * * * is no longer accurate based upon the amendment to Section §7623 [sic] enacted in Section 41108 of the Bipartisan Budget Act of 2018 which amended 26 USC §7623 to provide that awards are to be based upon proceeds 'without regard to whether such proceeds are available to the Secretary.'"

Fifth, petitioner lodges numerous complaints about the adequacy of the investigation conducted in response to the information he provided in his initial claim. According to petitioner:

> IRS agent Ari Grellas recommended that the IRS conduct an examination of the S Corporation return on three basic issues (i) overstated deductions for cost of goods sold; (ii) fabricated deductions for marketing rights; and deduction of unsupported operating expenses. * * * Once the claim was referred out to the IRS examining agent Diana [sic] Beers, who abuse [sic] her discretion by ignoring the evidence submitted in the First Whistleblower Claim supporting these 3 issues and failing to have Mr. Glikman obtain accurate information from the Petitioner supporting these 3 issues.

[*19] Petitioner claims that Ms. Beers "did everything she could to limit the audit adjustment" because "she was functioning as not as [sic] an IRS examining agent but as an advocate for the non-compliant taxpayer." He accuses Ms. Beers of "smear[ing] the information [he] provided" to "justify her recommendation to deny an award." According to petitioner, Ms. Beers "ignored th[e] evidence" he provided and accepted the S corporation's word "as gospel". In particular, he alleges that Ms. Beers inappropriately allowed the S corporation "to 'estimate' its cost of goods sold for 2012 based upon its historical deductions for cost of goods sold". He also claims that Ms. Beers failed to investigate whether Taxpayer 1 had sufficient basis in his stock in the S corporation to deduct his share of the corporation's 2012 loss.[7] Petitioner asserts that "there is nothing in the Administrative Record to indicate that either Ms. Beers or Mr. Glikman knew of the concept of tax basis or addressed it."

Finally, petitioner argues that "Mr. Glikman breached his statutory obligations under the Whistleblower Act by failing to refer the Second

---

[7]Sec. 1366(d)(1) provides that the aggregate amount of losses and deductions from an S corporation that a shareholder can take into account for any taxable year cannot exceed the sum of the shareholder's adjusted basis in the shareholder's stock in the S corporation and any indebtedness of the S corporation held by the shareholder.

[*20] Whistleblower Claim to the appropriate IRS operating division." Petitioner alleges that the "issues of estate taxes" he raised in his supplemental claim "were not addressed in the IRS audit of the income tax return of the S corporation[.]" He observes that the statute that required the Secretary of the Treasury to create the WBO requires that office to "analyze information received from any individual described in section 7623(b) of the Internal Revenue Code of 1986 and either investigate the matter itself or assign it to the appropriate Internal Revenue Service office". Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, sec. 406(b)(1)(B), 120 Stat. at 2960. Petitioner finds "amazing" Mr. Glikman's explanation for his decision not to refer petitioner's supplemental claim to the appropriate operating division. "[T]he entire rationale for Mr. Glikman's refusal to act", in petitioner's view, "is a non-sequitur." Petitioner argues: "An income tax audit that occurs prior to the death of the decedent has no logical limit on the decedent's estate tax liability arising from his death." He contends that "Mr. Glickman [sic] never had any intention of seriously evaluating the claim based upon the Internal Revenue Code and simply used any rationalization to avoid exercising his statutory obligations."

**[\*21]** III.  Analysis

A.  Admissibility of Exhibits to Glikman Declaration

We can readily dismiss petitioner's claim that portions of the administrative record respondent submitted are inadmissible hearsay.  Rule 802 of the Federal Rules of Evidence generally prohibits the admission of hearsay.  But those rules "apply [only] to proceedings in United States courts."  Fed. R. Evid. 101.  Thus, in determining petitioner's eligibility for an award, the WBO was not barred from considering hearsay evidence.  And in determining whether the administrative record supports the WBO's denial of an award, we must consider the contents of that record without regard to whether it might include evidence that would be inadmissible as hearsay in a trial de novo.  A court reviewing agency action for abuse of discretion must uphold the agency's factual findings if they are "supported by substantial evidence".  See, e.g., EchoStar Commc'ns Corp. v. FCC, 292 F.3d 749, 752 (D.C. Cir. 2002).[8]  In Consol. Edison Co. of N.Y., Inc. v.

---

[8]The "substantial evidence" standard appears in many statutes providing for judicial review of determinations by specific administrative agencies.  See, e.g., Richardson v. Perales, 402 U.S. 389, 390 (1971) (involving the Social Security Act); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys., 745 F.2d 677, 681 (D.C. Cir. 1984) (involving the Bank Holding Co. Act of 1956).  The provision in the Administrative Procedure Act governing

**[*22]** <u>NLRB</u>, 305 U.S. 197, 230 (1938), the Supreme Court suggested that "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." More recently, however, in <u>Richardson v. Perales</u>, 402 U.S. 389, 407-408 (1971), the Court warned that <u>Consol. Edison</u> should not be read to have effected "a blanket rejection * * * of administrative reliance on hearsay irrespective of reliability and probative value." Thus, the D.C. Circuit accepts that "administrative agencies are not barred from reliance on hearsay evidence." <u>Crawford v. USDA</u>, 50 F.3d 46, 49 (D.C. Cir. 1995). Indeed, hearsay evidence "can constitute <u>substantial</u> evidence if reliable and trustworthy." <u>Id.</u> Therefore, if an agency relies on hearsay evidence in support of its factual findings, a court considering the determination the agency

---

judicial review of agency hearings provides the same standard. <u>See</u> 5 U.S.C. sec. 706(2)(E). The Court of Appeals for the D.C. Circuit, to which appeal of whistleblower cases lies, <u>see</u> sec. 7482(b)(1), has opined that "the substantial evidence test and the arbitrary or capricious test are one and the same", <u>Ass'n of Data Processing Serv. Orgs., Inc.</u>, 745 F.2d at 683. The substantial evidence test, in that court's view, "is only a specific application" of the more general arbitrary and capricious standard. <u>Id.</u> In cases to which 5 U.S.C. sec. 706(2)(E) does not apply--that is, cases that do not involve hearings subject to 5 U.S.C. secs. 556 and 557 (2018)--the arbitrary or capricious standard of 5 U.S.C. sec. 706(2)(A) will "perform[] th[e] function of assuring factual support". <u>Id.</u> But "there is no <u>substantive</u> difference between what * * * [the arbitrary and capricious standard] requires and what would be required by the substantial evidence test". <u>Id.</u> at 683-684. In either case, the agency's findings of fact must be supported by sufficient evidence to avoid a directed verdict. <u>Id.</u> at 684.

[*23] made on the basis of those findings can--indeed, must--consider the hearsay evidence as well in conducting its review for abuse of discretion.

Thus, even if we were to conclude that some portions of the administrative record respondent submitted would be hearsay under rule 802 of the Federal Rules of Evidence and not covered by one of the exceptions provided in rule 803 or 804, that conclusion would not justify our refusal to consider the evidence. Instead, under the substantial evidence standard, we would consider the evidence if we find it reliable and trustworthy. Petitioner does not question the reliability or trustworthiness of the Forms 11369 or any other documents included in the administrative record. Instead, he inappropriately relies on Rule 121(d) for what might be described as a "blanket rejection" of hearsay. Perales, 402 U.S. at 407-408. Accepting petitioner's argument would be contrary to applicable precedent established by the Supreme Court and the Court of Appeals for the D.C. Circuit.

B.      Transcripts as Evidence of Collected Proceeds

We see nothing on the IDRS transcripts for Taxpayer 1's 2014 and 2015 taxable years that evidences a tax liability that might be attributable to the information petitioner provided. Both transcripts show negative taxable income and tax and total payments of zero.

[*24] C.     Adequacy of Administrative Record

We can readily dismiss petitioner's claim that the WBO did not adequately consider the prospect that the reduction of Taxpayer 1's 2012 NOL resulted in collected proceeds for either 2010 or 2011.  If Taxpayer 1 had carried his 2012 loss, as initially reported, back to 2010 and 2011, as generally required by section 172(b)(1)(A)(i), he might have been entitled to a refund of the tax he paid for one or both carryback years.  Reduction of the 2012 loss would have entitled the Commissioner to recover part of any refunds paid.  The administrative record, however, includes evidence that Taxpayer 1 elected under section 172(b)(3) to relinquish the carryback period.  Both Mr. Glikman's Award Recommendation Memorandum and the Form 4549 Ms. Beers prepared in connection with her audits of Taxpayer 1's 2012 and 2013 returns refer to Taxpayer 1's section 172(b)(3) election.

The administrative record that respondent submitted also demonstrates that the audits conducted on the basis of the information petitioner provided did not result in collected proceeds in regard to Taxpayer 2 or Taxpayer 3 or in regard to Taxpayer 1's 2012 and 2013 taxable years.  As Mr. Glikman explained in his Award Recommendation Memorandum to Mr. Mitzel, the adjustments made to Taxpayer 1's 2012 and 2013 returns simply reduced reported NOLs.  So did the

[*25] one adjustment made to Taxpayer 2's 2012 return. Although Mr. Glikman acknowledged that the reduction in Taxpayer 2's NOL carryforward from 2012 would have increased Taxpayer 2's taxable income for subsequent years, he dismissed as impractical the prospect of trying to collect additional tax from Taxpayer 2's estate. And, as Mr. Glikman explained, the audit of Taxpayer 3's 2012 return resulted in no adjustments. Other documents in the administrative record support Mr. Glikman's description of the results of the audits conducted on the basis of petitioner's information.

It is less clear, however, that the administrative record supports the conclusion that no proceeds were collected in regard to Taxpayer 1's 2014 or 2015 taxable year. Mr. Glikman's conclusion that "there are no current or future collected proceeds in regard to * * * [Taxpayer 1]" does not follow from his stated premise that Taxpayer 1's "2014 and 2015 returns were filed with zero tax liability and show large negative taxable income in each year." The validity of Mr. Glikman's conclusion turns on whether Taxpayer 1's final returns reflected the adjustments made in the audit of his 2012 return or the S corporation's 2014 return. In the second supplement to his motion for summary judgment, respondent concedes that giving effect to the adjustments made to Taxpayer 1's 2012 and 2013 returns would have resulted in substantial taxable income for 2014 and 2015 if

[*26] Taxpayer 1's returns for those years did not already take into account those audit adjustments but did reflect the S corporation's amended return for 2014.[9] Respondent seeks to dismiss that possibility as involving "a very narrow set of conditions." We are not convinced. When Taxpayer 1's representatives filed his 2014 and 2015 returns, they would have had reason to know of the favorable changes reported in the S corporation's amended return for 2014 and could have been expected to take those changes into account in preparing Taxpayer 1's final returns. Of course, Taxpayer 1's representatives would also have had reason to know at that time of the results of the audits of his 2012 and 2013 returns. Even so, whether they chose to reflect the audit adjustments in Taxpayer 1's final returns would have depended on whether they agreed with the adjustments. Because the adjustments simply reduced reported NOLs for Taxpayer 1's 2012 and 2013 taxable years, they did not result in the issuance of a notice of deficiency for either year. Neither Taxpayer 1 nor his representatives had the opportunity to challenge the adjustments in regard to the taxable years for which they were made. Their first opportunity to challenge the adjustments, had they disagreed with them, would

---

[9]In our order of March 24, 2021, we calculated the potential taxable income of Taxpayer 1 under the circumstances described as $130,719 for 2014 and $42,416 for 2015. We do not understand respondent to dispute those figures.

[*27] have been by preparing Taxpayer 1's returns for 2014 and 2015 in a manner consistent with the original returns filed on his behalf for 2012 and 2013. In short, the circumstances in which giving effect to the audit adjustments made for 2012 and 2013 would have given rise to positive taxable income for Taxpayer 1 for 2014 and 2015 strike us as quite plausible.

In any event, the record before us gives no indication that Mr. Glikman or Mr. Mitzel even considered the possibility of available proceeds in respect of Taxpayer 1's 2014 and 2015 taxable years. Mr. Glickman seems to have assumed that the adjustments made in regard to Taxpayer 1's 2012 and 2013 taxable years merely reduced NOLs that expired upon his death. Mr. Glikman's amended declaration made that assumption explicit. As amended, his declaration states that "[t]he remaining net operating loss to which he [that is, Taxpayer 1] would have been entitled was extinguished upon his death." As noted above, respondent's motion for summary judgment makes the same claim. Even in the second supplement to his motion for summary judgment, respondent continues to assert: "Based on the evidence in the administrative record, although the IRS took actions based on the petitioner's information that led to the reduction of NOLs, this reduction did not result in tax liability, and the NOLs were extinguished at the time of * * * [Taxpayer 1's] death in 2015. Therefore, as reflected in the administrative

[*28] record, no proceeds were collected." Respondent makes this assertion even though, in the same submission, he acknowledges the possibility that, at least in some circumstances, the adjustments made in the audit of Taxpayer 1's 2012 and 2013 returns would have resulted in positive taxable income for 2014 or 2015.

In short, the administrative record does not support the premise on which the WBO based its conclusion. In particular, the record does not establish that the adjustments made in the audits of Taxpayer 1's 2012 and 2013 returns merely reduced NOL carryovers that necessarily expired with his death. The inadequacy of the record to support the premise on which Messrs. Glikman and Mitzel purportedly relied does not establish that the IRS, in fact, did collect proceeds on the basis of the information petitioner provided. But it does call into question whether the administrative record respondent submitted adequately supports the WBO's determination to deny petitioner an award. Ideally, perhaps, Mr. Mitzel should have sought clarification from Mr. Glikman about the questions left unanswered in Mr. Glikman's Award Recommendation Memorandum.

Under the circumstances, however, we need not decide whether Mr. Mitzel's apparent failure to pursue those questions means that the WBO abused its discretion. Were we to reach that conclusion, the normal recourse would be to remand the case to the WBO for further consideration. Remand is inappropriate,

[*29] however, in circumstances in which "[t]here is not the slightest uncertainty as to the outcome of a proceeding" before the agency on remand, so that "remand would be an idle and useless formality." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969). In the present case, we have no doubt about the determination the WBO would reach on petitioner's request for a whistleblower award were we to remand the case. The certificates respondent submitted with the second supplement to his motion for summary judgment show that, as of May 4, 2021, no tax had been assessed and no payments of tax made for Taxpayer 1's 2014 or 2015 taxable year. Respondent makes no argument that the certificates were inappropriately excluded from the administrative record or that they are admissible as extrarecord evidence. Nonetheless, we accept the certificates as substantial evidence that, regardless of whether Taxpayer 1 died with unused NOL carryforwards, the IRS collected no proceeds in regard to Taxpayer 1's 2014 or 2015 taxable year on the basis of the information petitioner provided.[10] Even accepting respondent's concession that we cannot consider the certificates in

---

[10]We reject petitioner's argument that neither certificate is "a real IRS transcript". We have accepted Forms 4340 as evidence of the assessment and payment of tax liabilities. See, e.g., Davis v. Commissioner, 115 T.C. 35, 40-41 (2000).

[*30] determining whether the WBO abused its discretion in denying petitioner an award, we are aware of no rule of law that prevents us from taking the certificates into account in assessing the result that would obtain were we to conclude that the WBO did abuse its discretion and, consequently, remand the case to the WBO for further proceedings. The certificates demonstrate that "remand would be an idle and useless formality." Id. at 766 n.6.

D.      2018 Amendment to Section 7623(b)(1)

Section 7623(b)(1), as amended by the Bipartisan Budget Act of 2018 (Budget Act), Pub. L. No. 115-123, sec. 41108, 132 Stat. at 158, provides:

> If the Secretary proceeds with any administrative or judicial action described in subsection (a) based on information brought to the Secretary's attention by an individual, such individual shall, subject to paragraph (2), receive as an award at least 15 percent but not more than 30 percent of the proceeds collected as a result of the action (including any related actions) or from any settlement in response to such action (determined without regard to whether such proceeds are available to the Secretary). The determination of the amount of such award by the Whistleblower Office shall depend upon the extent to which the individual substantially contributed to such action.

**[\*31]** The Budget Act (among other things) added the second parenthetical.[11] The amendments to section 7623 made by the Budget Act "apply to information provided before, on, or after the date of enactment of th[e] Act with respect to which a final determination for an award has been made before such date of enactment." Budget Act sec. 41108(d).

Petitioner reads the parenthetical "determined without regard to whether such proceeds are available to the Secretary" to have eliminated the requirement of collected proceeds for a mandatory award under section 7623(b)(1). That reading ignores the rest of the paragraph in which the parenthetical appears.

A mandatory award under section 7623(b)(1) still depends on the Secretary's proceeding "with an[] administrative or judicial action". The amount of the required award remains a percentage of "the proceeds collected as a result of the action (including any related actions) or from any settlement in response to such action".

---

[11]In Lewis v. Commissioner, 154 T.C. 124, 133 (2020), we held that, "for purposes of the effective date of the [2018] amendments, 'a final determination for an award' does not occur until after the whistleblower award can no longer be further challenged in this Court or elsewhere." Therefore, the 2018 amendments apply to the information petitioner provided.

[*32] The addition of the "determined without regard" parenthetical is consistent with the statutory definition of "proceeds" included among the 2018 amendments and appearing in section 7623(c). Section 7623(c)(2) includes in "proceeds" "any proceeds arising from laws for which the Internal Revenue Service is authorized to administer, enforce, or investigate, including--(A) criminal fines and civil forfeitures, and (B) violations of reporting requirements." Thus, the 2018 amendments codify the interpretation of "proceeds" adopted in Whistleblower 21276-13W v. Commissioner, 147 T.C. 121 (2016), supplementing 144 T.C. 290 (2015). See also Lewis v. Commissioner, 154 T.C. 124, 131-132 (2020) ("By including criminal fines and civil forfeitures in the definition of proceeds, Congress conformed the text of the statute to our holding in Whistleblower 21276-13W[.]"). In Whistleblower 21276-13W v. Commissioner, 147 T.C. at 126, 139, we held that "civil forfeitures constitute collected proceeds for purposes of an award under section 7623(b)(1)", rejecting the Commissioner's argument that "only those proceeds assessed and collected under a provision of title 26 may be used to pay a whistleblower award". The "determined without regard" parenthetical acknowledges that "proceeds", as defined in section 7623(c), can include amounts collected under laws that the IRS can administer, enforce, or

[*33] investigate, even if the amounts are received by an agency other than the Department of the Treasury.

Our Opinion in Lacey v. Commissioner, 153 T.C. 146 (2019), confirms that the 2018 amendments did not affect the viability of the proposition reflected in Cooper and Cohen that a whistleblower's entitlement to an award depends on both the initiation of an administrative or judicial action and the collection of proceeds. In fact, in Lacey, we grounded those conditions not in our prior Opinions in Cooper and Cohen but instead in "the plain words of section 7623(b)(1)," taking into account the amendments to that section. Id. at 159.

Lacey did, however, demonstrate that Cohen no longer justifies granting summary judgment in the Commissioner's favor simply because the information provided by a whistleblower did not result in the collection of proceeds. Lacey addressed the WBO's repeated "rejections" of a whistleblower's claims. Regulations issued in 2014 created "rejection" as a then-new "species of determination". Id. at 177 (Urda, J., concurring). Section 301.7623-1(c)(4), Proced. & Admin. Regs., provides that, if a whistleblower fails to offer "specific and credible information" concerning a violation of internal revenue laws, "the Whistleblower Office may reject the claim or notify the whistleblower of the

[*34] deficiencies and provide the whistleblower an opportunity to perfect the claim for award."

In <u>Lacey</u> the WBO twice rejected the whistleblower's claims. When it rejected his initial claim, it gave him the opportunity to perfect it. The whistleblower made a submission with more detailed information. And the WBO rejected his claim again. <u>Lacey v. Commissioner</u>, 153 T.C. at 155-156.

The whistleblower in <u>Lacey</u> argued that the WBO had abused its discretion in rejecting his second claim and asked the Court to remand the case. The Commissioner sought summary judgment upholding the WBO's rejection of the whistleblower's claim.

The materials submitted by the parties in <u>Lacey</u> in support of and opposition to the Commissioner's motion for summary judgment suggested the possibility that the WBO had rejected the whistleblower's second claim simply by issuing a form letter without having evaluated the claim against the threshold standards specified in section 301.7623-1(c), Proced. & Admin. Regs., for consideration of a claim. The Commissioner argued that the degree of consideration afforded the whistleblower's second claim was irrelevant. All that mattered, in his view, was that, for whatever reason, the IRS had not commenced an administrative action on

[*35] the basis of the whistleblower's information and thus had not collected any proceeds.

We found untenable the prospect that the WBO might be free to dispose of a whistleblower's claim without giving it due consideration and then sending the whistleblower a form letter rejecting the claim. We read section 7623(b)(4) to provide us the means of preventing that possibility. Section 7623(b)(4) gives the Court jurisdiction to review "[a]ny determination regarding an award" under section 7623(b)(1), (2), or (3). We reasoned that the WBO's rejection of the whistleblower's claim in Lacey was "a determination regarding an award." Therefore, we concluded that we had jurisdiction to review the WBO's determination that the whistleblower's second claim (like his first) did not meet the threshold standards for further consideration. We denied the Commissioner's motion for summary judgment in Lacey because we viewed as a disputed question of material fact the extent of the consideration the WBO gave to the whistleblower's claim. The Commissioner's ability to demonstrate the absence of collected proceeds did not entitle him to summary judgment. As noted above, however, we reaffirmed in Lacey that a whistleblower's entitlement to an award depends on initiation of an administrative or judicial action and collection of proceeds.

**[\*36]** Finally, petitioner's interpretation of section 7623(b)(1), as amended in 2018, is nonsensical. If a whistleblower's entitlement to an award no longer depends on the collection of proceeds, how would the amount of the required award be determined? As a percentage of the proceeds that would have been collected had the IRS conducted an audit satisfactory to the whistleblower? Petitioner never explains.

In sum, the proposition established in Cooper and Cohen that a whistleblower's entitlement to an award under section 7623(b)(1) depends on both the initiation of an administrative or judicial action and the collection of proceeds remains settled law. Petitioner is not entitled to an award under section 7623(b)(1) unless the actions undertaken on the basis of the information he provided resulted in the collection of proceeds.

E. Adequacy of Investigation

We can also readily dismiss petitioner's challenge to the adequacy of the IRS' investigation. For starters, contrary to petitioner's claim, the record demonstrates that Mr. Glikman, at least, was aware of the limitation imposed by section 1366(d) on the deductibility of flowthrough losses and deductions of an S corporation. Mr. Glikman alluded to that limitation in both his memorandum of

[*37] March 20, 2014, in which he referred petitioner's case for investigation and in his Award Recommendation Memorandum to Mr. Mitzel.

The materials included in the record do not establish whether Ms. Beers followed through on Mr. Grellas' suggestion to review transactions between Taxpayer 1 and the S corporation. The materials related to the examination of Taxpayer 1's 2012 and 2013 taxable years do not address the adequacy of his basis in stock or debt in the S corporation to support the claim of his pro rata share of the corporation's losses. Moreover, the Form 4549-A that Ms. Beers prepared concerning Taxpayer 3's 2012 return could be read to indicate that she considered the passive loss limitations of section 469 as the only possible explanation for Taxpayer 3's failure to report her full share of the S corporation's loss, without also considering the potential impact of section 1366(d).

In short, while the record demonstrates that the potential impact of section 1366(d) on the deductibility by Taxpayers 1 and 3 of their shares of the S corporation's losses was not ignored, we are unable to determine the extent to which Ms. Beers, in particular, considered the question. The adequacy of Ms. Beers' examination of that or any other issue, however, has no bearing on our review of the WBO's determination to deny petitioner an award.

[*38] We have consistently disclaimed any authority to oversee, and judge the adequacy of, any administrative actions undertaken in response to whistleblower information.  As we explained in Cohen v. Commissioner, 139 T.C. at 302:  "Our jurisdiction under section 7623(b) does not contemplate that we review the Commissioner's determinations of the alleged tax liability to which the claim pertains."  See also Whistleblower 23711-15W v. Commissioner, T.C. Memo. 2018-34, at *21 ("Our authority [in whistleblower cases] is limited to determining whether the IRS in fact collected proceeds; it does not extend to speculating whether the IRS might have collected proceeds if it had chosen to pursue an examination or if prosecutorial discretion had been exercised differently."). Although Lacey clarified that the absence of collected proceeds does not entitle the Commissioner to summary judgment in all cases, we nonetheless reaffirmed that "[t]he IRS and not the Tax Court decides whether and how to audit a taxpayer's return, and section 7623(b)(4) confers on the Tax Court jurisdiction not to supervise audits but to review the acts of the WBO."  Lacey v. Commissioner, 153 T.C. at 167.  And in Lewis v. Commissioner, 154 T.C. at 137, we wrote:  "We do not have authority under section 7623(b)(4) to review the Commissioner's determination of the target's tax liability."

**[\*39]** Petitioner's complaint, like that of the whistleblower in <u>Apruzzese v. Commissioner</u>, T.C. Memo. 2019-141, at \*12, <u>aff'd</u>, 811 F. App'x 1 (D.C. Cir. 2020), is "that the IRS allowed the target to pay less in tax than \* \* \* [he or she] should have." As we acknowledged in <u>Apruzzese</u>, we have no authority to redress that grievance, whatever its merits.

F.    Failure To Investigate Supplemental Claim

The administrative record does not support the factual predicate underlying Mr. Glikman's decision not to seek investigation of petitioner's supplemental claim. Mr. Glikman viewed referral of petitioner's supplemental claim to an operating division as unnecessary because the issue raised had already been audited. Mr. Glikman refers to Ms. Beers' audit of Taxpayer 3's 2012 income tax return. As part of that audit, Ms. Beers, with the concurrence of her group manager, concluded that no adjustment was necessary concerning the treatment of the payments Taxpayer 3 received from the S corporation, ostensibly for marketing rights. But Taxpayer 3's proper reporting of royalty income (and the S corporation's entitlement to deduct its royalty payments) does not rule out the possibility that Taxpayer 3 originally received the licensed property as a gift from her father on which he failed to pay gift tax. If petitioner's information is accurate, any taxable gift would have occurred many years before that covered by

[*40] Ms. Beers' audit. Although the Form 11369 she prepared regarding that audit makes passing reference to the arrangement's having "the appearance of being a gift", that form does not indicate the extent, if any, to which Ms. Beers considered the possibility of unpaid transfer tax arising from a gift made many years before. Ms. Beers could not have considered petitioner's supplemental claim when she audited Taxpayer 3's 2012 return because petitioner filed his claim only after Ms. Beers had completed her audit. Although we accept that Ms. Beers was qualified to conduct an income tax audit, it does not follow that she was also qualified to assess the possibility of unpaid transfer tax.

Even if Mr. Glikman's decision not to refer petitioner's supplemental information to the appropriate operating division rested on a false premise, however, petitioner makes no claim that respondent collected gift tax as a result of his use of that information. In fact, respondent could not have collected proceeds on the basis of petitioner's information because he did not use that information to commence an administrative or judicial action.

In Lacey v. Commissioner, 153 T.C. at 163, we accepted that, while we have authority to review WBO determinations, this Court is not "an overseer of the IRS's audit and collection activity." We cannot "direct the IRS to commence or

[*41] continue an audit." Id. at 166. Nor can we "require the IRS to explain a decision not to audit". Id. at 164.

Our subsequent opinion in Cline v. Commissioner, T.C. Memo. 2020-35, confirms that we cannot review decisions not to audit and, moreover, that that limitation on our jurisdiction applies regardless of whether the decision in question was made by the WBO or by an operating division. The whistleblower in Cline submitted two claims. The WBO denied the first and rejected the second. The WBO chose not to forward the first claim to the appropriate operating division because it "determined that the period of limitations on assessment for the relevant years had expired." Id. at *16. "To the extent that the denial of Mr. Cline's claim encompassed a decision not to audit," we wrote, "we do not review that decision." Id.

As petitioner reminds us, the legislation that established the WBO requires it to "analyze information received from * * * [a whistleblower] and either investigate the matter itself or assign it to the appropriate Internal Revenue Service office". Tax Relief and Health Care Act of 2006, sec. 406(b)(1)(B). Reconciling the text of the enabling legislation with our holding in Cline requires us to conclude that "investigate" can mean whatever investigation the WBO determines to be necessary. That is, the WBO fulfills its statutory obligation to "investigate

**[\*42]** the matter itself" when it determines that no further investigation is necessary beyond any that might have occurred to date. It follows that section 7623(b)(4) does not allow us to review Mr. Glikman's decision not to refer petitioner's supplemental claim to the appropriate operating division.

G.    Conclusion

Respondent argues that the WBO did not abuse its discretion when it denied petitioner a whistleblower award on the premise that no proceeds were collected on the basis of the information petitioner provided. As explained above, the administrative record does not fully support that premise. But that record together with additional documentation that respondent provided with his second supplement to his motion for summary judgment does support the premise on which the WBO denied petitioner an award. Because respondent makes no argument that the supplemental documentation was inappropriately excluded from the administrative record or should be admitted as extrarecord evidence, we do not consider that documentation in determining whether the WBO abused its discretion in denying petitioner an award. But we see no reason to ignore the supplemental documentation for the purpose of anticipating the consequences of a remand of the case. We have no doubt that, were we to remand the case, the WBO would add the supplemental documentation to the administrative record and, on the basis of that

[*43] expanded record, would again deny petitioner an award. In other words, "remand would be an idle and useless formality." Wyman-Gordon Co., 394 U.S. at 766 n.6. Accordingly, we need not decide whether the WBO abused its discretion when it denied petitioner an award on the basis of an administrative record that does not fully support the premise on which the WBO made its determination. Instead, we will grant respondent's motion for summary judgment, as supplemented.

An appropriate order and decision will be entered.